McLaughlin v. Louisville Electric Light Co.

CASE 31—PETITION ORDINARY—NOVEMBER 25.

## McLaughlin v. Louisville Electric Light Co.

APPEAL FROM JEFFERSON CIRCUIT COURT, COMMON PLEAS DIVISION.

1. INTERESTED JUROR—STOCKHOLDER.—One who is a stockholder in a corporation, which corporation is a stockholder in another corporation which is the defendant in an action, has an interest in, the action which disqualifies him as a juror therein.

2. ELECTRIC WIRES—INSULATION—NEGLIGENCE.—At places where people have the right to go for work, business or pleasure, electric light companies are required to afford them perfect protection from its wires, by having them perfectly insulated, and the fact that such protection would be very expensive and inconvenient is no excuse for the failure to provide it. Very great care in affording protection, might be sufficient as to the wires at points remote from public passways, buildings or places where persons need not go for work or business.

| | |
|---|---|
| 100 | 173 |
| 108 | 229 |
| 100 | 173 |
| 110 | 68⁴ |
| 100 | 173 |
| 116 | 456 |
| 100 | 173 |
| 116 | 456 |
| 100 | 173 |
| 122 | 482 |
| 122 | 485 |
| 100 | 173 |
| 137 | 361 |

JUNIUS C. KLEIN FOR APPELLANT.

1. Upon the fact being disclosed that a juror is a stockholder in a corporation that was the owner and holder of all of the capital

stock of another corporation that was a party to the suit, the court should have ordered his name stricken from the list.

2. The court should have instructed the jury that electric light wires should be so insulated or protected as to be free from danger. (Thompson on Law of Electricity, sec. 65; Clements v. Louisiana Electric Light Co., 11 S. Rep., 51; Girandi v. Electric Imp. Co. of San Jose, 40 Pac. Rep., 108.)

3 The plaintiff was not guilty of contributory negligence in inadvertently touching an electric wire while in the discharge of his duty. (Clements v. Light Co., 11 S. Rep., 51; Haynes v. Gas Co., 19 S. E. Rep., 344.)

PHELPS & THUM FOR APPELLEE.

1. If one contributed to produce the injury complained of, so that but for his co-operating fault the injury could not have happened, he can not recover. (Paducah v. Hall, 12 Bush, 46; Dolfinger v. Fishback, 12 Bush, 479-80; Sullivan v. Louisville Bridge Co., 9 Bush, 84; Louisville & Portland Canal v. Murphy, 9 Bush, 533.

2. It is not ground for reversal that one of the regular jury panel was indirectly interested in a corporation that was a party to the suit, when that juror did not serve in the case, even though the court refused to have him stricken from the panel.

GIBSON & MARSHALL ON SAME SIDE.

1. In the superintendence of the process of impaneling the jury a large discretion is confided to the judge, which discretion will not be revised unless it appears to have been grossly abused or exercised contrary to law. (Thompson on Trials, sec. 88.)

2. The court properly refused to instruct the jury that the injury to plaintiff was conclusive proof that the insulation of the wire was defective.

O'NEAL, PHELPS & PRYOR OF COUNSEL ON SAME SIDE.

GIBSON & MARSHALL, O'NEAL & PRYOR AND PHELPS & THUM

IN PETITION FOR REHEARING.

1. There is no such thing known to science as the perfect insulation of electric wires, and the rule laid down in the opinion requiring "perfect insulation and protection" to be afforded by the company requires of it an impossibility.

2. The correct rule is that electric companies are required to exercise the utmost degree of care in the construction, inspection and repair of their wires and poles, to the end that travelers along the highway may not be injured by their appliances. The danger is great, and the care and watchfulness should be commensurate with it. (Haynes v. Gas Co., 114 N. C., 211; Keasby on Electric Wires, sec. 13, p. 106.)

JUDGE GUFFY DELIVERED THE OPINION OF THE COURT.

It is alleged in the petition in this action that "the plaintiff is and was on the 8th day of July, 1893, a painter by trade, and followed the same for a livelihood, and was on said 8th day of July, 1893, engaged in painting a house on the east side of Fourth street, in the said city of Louisville, between Market and Main streets, and numbered —; that on said 8th of July, 1893, and long prior thereto, the defendant, its agents and servants had erected and maintained one of its electric wires, charged with electricity, on the side of said house facing Fourth street; that the said wire on the said 8th day of July, 1893, and long prior thereto, was insufficiently, carelessly and negligently insulated, and that defendant, its agents and servants were well aware of said want of insulation, or could have been aware of same by the exercise of proper diligence; that plaintiff on said 8th day of July, 1893, while in the discharge of his duties as painter aforesaid and without fault on his part, came in contact with said wire which at the said time was heavily charged with electricity by the defendant, its agents and servants whereby he was severely shocked and rendered insensible, and that he remained insensible and unconscious for twenty minutes and more; that he

suffered severe pain, both physically and mentally, by reason of said shock, and that the flesh on his left hand was burnt and blistered to such an extent as to render the said hand useless, and that ever since and now said plaintiff is unable to use said hand in the performance of his vocation as a painter; that plaintiff is rendered less able thereby to make a living at his trade as a painter; that the said injuries received by the plaintiff are permanent, and his entire nervous system, by reason of said shock, is unbalanced, causing plaintiff much and severe pain; that the said injuries complained of herein were caused wholly by the gross negligence of the defendant, its agents and servants, that the plaintiff has been damaged, by reason of said injuries, in the sum of two thousand five hundred dollars. Wherefore, plaintiff prays judgment against the defendant for the sum of two thousand five hundred dollars, and for his costs and for all proper relief."

The defendant filed a demurrer to the petition which was overruled by the court.

The first paragraph of the answer substantially denies all the averments in the petition which show any right to recover.

The second paragraph of the answer is as follows: "Further answering this defendant says that the injuries received by the plaintiff, and set forth in the petition, were received wholly and entirely because of his want of proper care and caution in looking out for his own safety, and by reason of his carelessness in coming in contact with an electric light wire which he knew, or

by the exercise of ordinary care for his own safety could have known, was then and there charged with a current of electricity, making it dangerous to life for any one to come in contact with the said wire. Defendant says that by the exercise of ordinary care for his own safety, and such as circumstances and surroundings made it apparent was necessary, the said plaintiff could have avoided coming in contact with said wire, and could have escaped all injury therefrom. Defendant says that plaintiff came into contact with said wire by failing to exercise that degree of care which he knew, or ought to have known, under the circumstances was necessary to be exercised by him to avoid injury from said wire. Wherefore, having answered, defendant prays to be dismissed."

The reply of plaintiff traversed the allegations of the answer. The jury found for the defendant, and his petition was dismissed.

Appellant relied on these grounds for new trial, viz:

1st. That the court erred in refusing to instruct the jury as requested by plaintiff in instructions Nos. 1, 2, 3, 8 and 9.

2d. That the verdict of the jury is not sustained by sufficient evidence.

3d. That the court erred in not excusing a juror, William Pryott, for cause, he being a stockholder in the Louisville Gas Co., and it being the owner of the stock in the defendant company.

The motion for new trial was overruled, and plaintiff has appealed.

The plaintiff below (appellant here) testified in substance as follows: "S. T. McLaughlin testified that he was twenty-two years of age, and a house painter by trade; was a contractor in that line, and had the job, in conjunction with Asa Carr, of painting the front of H. C. Green's hotel, known as the Fourth Avenue Hotel, and had almost finished the work on the 8th day of July, 1893, when he came in contact with one of the defendant's electric wires, near the side of a window, and received a shock; that the defendant had two wires running from the west side of Fourth street, in Louisville, Ky.; that these two wires were fastened to brackets attached to the side of the wall between the first and second windows of the hotel, counting from the north; these windows were on the second floor of the building; the first floor was occupied by business firms; that these brackets were fastened to the wall about six inches from each window and about five feet above the sill of the windows; that defendant had an iron box, called a converter, attached to the side of the hotel building, midway between these two windows; that this box was about a foot above an iron cornice, running the full length of the building, immediately below the windows, about six inches below; that these two wires ran from the brackets to the top of this converter or box; that plaintiff was shocked by the wire next to the north side of the second window, at a place where the wire was joined together, and about halfway between the bracket and the converter; that this wire ran down from its bracket along the side of the window, and six inches

from the window, for about two feet, and then turned over north to the converter; that the iron cornice was about twelve inches wide, space enough for a man to stand on conveniently and paint; that he and his men had to use this cornice to work from, as there were wires preventing the staging or swinging ladder from being let down between them; when he had painted down to the bracket and wires he pulled the staging up out of the way and painted around the wires and the iron box while standing on the iron cornice; the window sill was outside, about five inches by five inches, and rested on the iron cornice inside of wood, about a foot wide; that he had put several coats of paint on the house, and was through, with the exception of touching up the right hind ear of the iron box; that he was in the act of getting out of this second window on the cornice to touch up this ear when he received the shock; that he had taken his brush full of paint in his right hand, and nothing in his left, and was on the sill of the window, turning back out onto the cornice, when he used his left hand to steady himself against the north side of the window opening, when his hand came in contact with the wire and he received the shock which rendered him unconscious, and he did not know anything more for about a half an hour, when he was revived, and found himself inside of the house, with Asa Carr, W. J. Cody his employe, and Mr. H. C. Green working with him to revive him; that his left hand was burnt and blistered on the third and fourth fingers, and at the edge of the palm at base of small finger; that he suffered a great

deal at the time of the shock and long afterward; that he went home and went to bed for a week; that he has never fully recovered the full use of his left arm and hand; that he has not been able to work at his trade or calling on account of the weakness of his hand; that he can not properly handle the brush and ropes; that in his trade it requires strong hands and arms to hoist and lower one's self on the staging; that he has not had any work at his trade at all; that he did and is working as a hand on the steamer———, plying between Louisville and Cincinnati; has worked about two months; that there was no sign or anything else to warn him of a danger about or near those wires."

On cross-examination said S. T. McLaughlin testified that "no one warned him at any time about those wires; that he did not know Squire Green, but did know Mr. Green, proprietor of the hotel; that Squire Green did not tell him to keep away from those wires; did not see Squire Green around the building the day before the accident; Squire Green did not offer to cut the wires if he wanted it done, nor did he tell Squire Green he could get along without the wires being cut; that no one told him that the wires were alive or dangerous; that he knew electric wires were dangerous, but that he had been working around the wires all the week and all seemed to be insulated, and yet he was not hurt; that he did not know electricity was turned on; that it was about noon of the 8th day of July, 1893, that he was hurt; that he saw no lights about the building; that he came up to the office of the defendant one Sunday night,

whether the first Sunday after the accident or not he did not remember; was there because Mr. Smith had sent for him; did not tell Mr. Smith or any one else that he was not hurt or was scared more than hurt, and did tell him then and there that he was hurt, and showed him his hand and pointed out places where it was burned; that he did not meet Squire Green every other Sunday on Third and Jefferson streets. Witness then showed his hand to the jury, pointing out the only indi-cations of the burn at edge of palm; that what appeared to be a wart there was not a wart. It was not there when he was shocked. It came there afterwards when it healed up."

Wm. J. Cody testified: "Was working there on the 8th day of July, 1893, the day on which Sam McLaughlin was hurt; that he was standing on the first window inside of same stirring some paint; the work of painting the building was finished, with the exception of a little space below the second window sill and one of the ears of the iron box on the side of the house between the first and second windows; that McLaughlin got his brush full of paint and was going out to paint this ear, and while I was at the first window he started to get out of the second window with his brush in his right hand; had nothing left in his left; he had hardly gotten into the window opening when I heard a groan, followed immediately by a second one, and then I leaned out of the window and looked in the direction of the groans and saw McLaughlin have hold of the electric wire between this iron box and a bracket, right on the joint

of the wire; I quickly ran to the second window, put my right arm between him and the north side of the window out around his body, then reached out over his head and took hold of the wrist of his left hand and jerked it loose from the wire and lifted him into the building and laid him down on the floor.   About that time Asa Carr came into the room and then Mr. Green, of the hotel.   We all rubbed him, walked him and slapped him for fully twenty minutes before he was revived.   At the time I pulled his hand loose from the wire I received a shock myself, but not enough to hurt me.   McLaughlin, when I reached him, was doubled up, partly on the window sill and one leg out on the iron cornice below the window.   He suffered a great deal; was unconscious for fully twenty minutes; examined the joint he had hold of immediately after we got him to himself; found the joint very loose and rotten.   One end of the stuff used in wrapping it was hanging down about two inches.   The wires all seemed to be covered with insulation. The place McLaughlin had hold of this wire was very near the north edge of the north side of the second window.   The bracket to which it was fastened was within six inches of the edge of the window. These windows were about three feet apart.   The sills were of wood and stone.   The stone was five inches wide and thick, and rested on an iron cornice running above the storerooms on the first floor.   This iron box or converter was placed against the wall between the first and second window in the middle, and about a foot above the iron cornice.   This wire entered at the top

of the box on the side.   The wires come from across the
street from the west side, and run over to these
brackets, and then down to the box.   Whenever we had
painted to the top down to these wires we pulled the
staging up out of the way and stood on this iron cornice
and painted from there.   The cornice is twelve inches
wide; had worked around the very same wire several
times; had experienced no shock, nor did he notice any-
thing wrong with the wire; all seemed insulated; did
not remember seeing Squire Green around there; did
not hear him nor anyone else warn McLaughlin to be-
ware of the wires.   Nothing was said about the wires
being dangerous."

Other witnesses testified as to the injury.

John M. Bunscomb testified as follows: "John M.
Bunscomb testified that he is an electrician; have run
similar plants to that of defendant; knows the defend-
ant's plant well and its power; formerly an employe
when the defendant was on Third street several years
ago.   Electric wires are always insulated—that is,
covered with a material that is a non-conductor.   This
is done to prevent a waste of power and for safety.
There are different grades of insulation.   The insulation
is put on at the factory.   Whenever it is desired to join
two ends of different wires the ends are scraped of all
insulation.   The clean ends are then twisted around
each other closely in order to make close connection.
After the joint is then soldered together, this makes a
perfect connection.   Then to protect this joint it is
wrapped usually with a rubber tape about an inch wide,

putting on five layers, which is considered by the underwriters as a sufficient insulation. This rubber tape adheres to itself, and if pressed and wrapped on tightly it will not come off easily. This is the method of wrapping joints in high tension wires, which is the character of the defendant's electric wires. These joints, as well as the regular insulation on the wires, is apt to rotten and wear off. The action of weather has something to do with this. The rubber will rotten in time, and in case a layer or two is thus rotten it will more easily catch moisture, which renders the joint dangerous. All wires are more or less dangerous when wet, as in raining weather, and if in such case a good ground was had I would not risk any of them. Iron cornice, as usually used above store buildings, form an excellent conductor, and standing on it and holding a wire charged with electricity of high tension, even though insulated and in dry weather, is risky. Also, most certainly so, in bad weather. Stone is not as good a conductor as iron in wet weather. Using it instead of iron I would not risk it. There is absolutely no perfect insulation, except at a great cost, which prevents it being extensively used. All insulation is affected by the changes in weather. Rubber, for instance, gets wet, and then it is dried by the sun. This soon wears it out. If a joint has on it less than five layers of wrapping it is just as much or more apt to be dangerous. The smallest pin hole is sufficient to let the electricity of these high tension wires escape in force enough to be fatal. If a joint is

wrapped loosely it will catch the rain and moisture and rotten sooner than if wrapped tightly and evenly. A joint with an end of the wrapping hanging down a couple of inches would be considered dangerous. The iron box referred to is a converter. It reduces the force of the current. The wires entering the converter are called the primary wires, and those leaving the box the secondary wires, which are not dangerous, because they carry a light current. Otherwise if a heavy current it would burn out the lamps. The full power or volt of the plant is used on those arc. lights we see in the streets, and only a small part is used for lights inside the stores and offices; have seen men apparently receive 2,000 volts of electricity without serious results. The amount taken though is mostly guess work—so many conditions enter into the estimation of amount actually received. Some men seem to be able to stand more than others; would not tempt even the best of insulation if I were standing on a good conductor, especially in wet weather."

At the conclusion of plaintiff's testimony the defendant asked the court to instruct the jury to find for defendant, which motion was overruled by the court.

The testimony of defendant conduced to show that defendant had used reasonable care, and that plaintiff was not severely injured. It also contends that plaintiff was guilty of contributory negligence.

The following are the instructions offered by plaintiff and refused by the court:

"1st. The court instructs the jury that it is the duty

of the defendant, the Louisville Electric Light Co., to so insulate or protect its wires as to make them free from danger to those who may be brought in contact with them; and if they shall believe from the evidence that the said company failed to so insulate or protect the wire with which S. T. McLaughlin came in contact, and that his injuries were caused by the reason of such failure, then the law is for the plaintiff, and they should so find, unless they shall further believe from the evidence that the said S. T. McLaughlin, by his own negligence, contributed to cause his injuries, and that he would not have been injured but for his contributory negligence, if any there was.

"2d. If the jury shall believe from the evidence that S. T. McLaughlin came in contact with said wire while in the act of climbing out of the window, and that the said wire was not so insulated or protected as to be free from danger to him, and that his injuries were caused thereby, they ought not to find him guilty of contributory negligence unless, in so doing, he failed to exercise that degree of care which ordinarily careful and prudent persons usually exercise under the same or similar circumstances.

"3d. That the injury to the plaintiff is conclusive proof of the defective insulation of the said wire and of negligence of the defendant.

"5th. Contributory negligence means the failure to observe that degree of care which ordinarily careful and prudent persons usually observe under the same or similar circumstances to protect themselves from in-

jury, and, by reason of such failure, help to cause or bring about the injury complained of.

"8th. That if they believe from the evidence that the said wire had all the appearances of having been properly insulated at the time plaintiff received his injuries, this was then an invitation or inducement to plaintiff to risk the consequences of contact with same in the performance of his work in painting the house to which said wire was attached.

"9th. That if the jury believe from the evidence that the plaintiff was not cautioned especially as to the dangerous condition of said wire before the accident occurred, then they are not to find him guilty of contributory negligence."

The instructions given are as follows:

"1st. The court instructs the jury that it is the duty of the defendant, the Louisville Electric Light Co., to so insulate or protect its wires at places where they may be dangerous to human life as to make them reasonably free from danger to persons who may come in contact with them; and if they shall believe from the evidence that the wire with which the plaintiff came in contact was not insulated or protected at the point where he caught it, and that he received the injuries of which he complains because thereof, then the law is for the plaintiff, and they shall so find unless they shall further believe from the evidence that he contributed to cause his injury by his own negligence, and that he would not have been injured but for his contributory negligence if any there was.

"2d. But unless they shall believe from the evidence that the defendant's wire at that point, mentioned in instruction No. 1, was not so insulated or protected as to make it reasonably free from danger, and that the plaintiff was injured thereby, the law is for the defendant, and they should so find.

"3d. Or if they shall believe from the evidence that the plaintiff was negligent, and thereby contributed to cause the injury of which he complains, and that he would not have been injured but for his contributory negligence, if any there was, then the law is for the defendant, and they should so find.

"4th. If the jury find for the plaintiff they should award him such a sum in damages as they may believe from the evidence would fairly compensate him for the mental and physical suffering endured by him by reason of his injuries, and for the loss of time and capacity to earn money at his trade and occupation. If they shall find from the evidence that the injuries of S. T. McLaughlin were caused by the negligence of the defendant, and shall further believe from the evidence that the negligence, if any there was, was gross, then they may, in their discretion, award him such a further or additional sum as punitive damages as they may deem right and proper under the evidence and these instructions, not exceeding in all the sum claimed in the petition."

Gross negligence means the absence of slight care.

"5th. Ordinary care means that degree of care which ordinarily careful and prudent persons usually observe under the same or similar circumstances.'

Negligence means the failure to observe ordinary care.

"6th. Contributory negligence means the failure to observe that degree of care which ordinarily careful and prudent persons usually observe under the same or similar circumstances to protect themselves from harm, and by reason of such failure helped to cause or bring about the injury complained of."

To the giving of instructions Nos. 1 and 2 the plaintiff excepted.

The demurrer to the petition was properly overruled, as was also the motion for instruction to the jury to find for the defendant. It also seems to us that William Pryott had a disqualifying interest in the action, and should have been excused for cause. But by far the most important question involved is the law applicable to the case.

Electricity is a powerful and subtle force, and its nature and manner of use not well understood by the public, nor is its presence easily determined or ascertained. Its use for private gain is very extensive, and becoming more and more so. The daily avocation of many thousands of necessity bring them near to this subtle force, and it seems clear that the electric companies should be held to the use of the utmost care to avoid injuring those whose business or pleasure requires them to come near such a death-dealing force.

In the case of Clements and wife v. Electric Light Co., 44 La., 695, *ct seq.*, the court said: "The deceased Clements was lawfully on the gallery roof. He was en-

gaged in a service that necessarily required him to run the risk of coming in contact with defendant's wires, either by stepping over them or going under them. It is probable that the latter mode was the most convenient, and there is no evidence that in so doing he incurred any greater risk. The wires were visible, and to all appearances were safe. The great force that was being carried over the wire gave no evidence of its existence. There was no means for a man of ordinary education to distinguish whether the wire was dead or alive. It had all the appearances of having been properly insulated. From this fact there was an invitation or inducement held out to Clements to risk the consequences of contact. He had a right to believe they were safe, and that the company had complied with its duties specified by law. He was required to look for patent and not latent defects. Had he known of the defective insulation and put himself in contact with the wire he would have assumed the risk. The defect was hidden, and the insulation wrapping was deceptive. It is certain, had it been properly wrapped, Clements would not have been killed. His death is conclusive proof of the defect of the insulation and the negligence of defendant.

"He exercised reasonable care in going under the wire in the performance of his duty, as he had a right to believe, from external appearances, that the wire was safe. His action was such as not to tend to expose himself directly to the danger which resulted in the injury. In fact there was no apparent danger. * * *

"It can not be said that when Clements went on the roof to repair it he went into the presence of known danger and assumed the hazards of the employment. The employment was not dangerous. The wires, if properly insulated as above stated, would have been harmless. It was only a remote danger which he had to risk, and this depending upon the fact whether or not the defendant company had done its duty as specified by law. The external appearances, the only indication of performed duty to which Clements' attention could be fixed, were guarantees that the defendant company had done its duty. These appearances assured him that in the performance of his work in sweeping the roof it was not dangerous for him to risk going over or under the wire. Bomar v. Railroad Co., 42 An., 983.

"Even in the presence of known danger to constitute contributory negligence it must be shown that the plaintiff voluntarily and unnecessarily exposed himself to it, unless it is of that character that the plaintiff must assume the risk from the very nature of the danger to which he is exposed. From the appearance of the wire, its wrappings with insulated tape, and the known duty of the defendant to protect the insulation at this particular splice or joint, Clements had no reason to anticipate danger, except from the fault of the defendant company. This fault was the cause of his death, and his act in passing under or over the wires was too remote to give it the character of contributory negligence."

The case of Haynes v. Gas Co., 114 N. C., 211, was an

action to recover for death caused by a boy taking hold
of a live broken wire that was in the street.   We quote
from the decision of the court as follows: "It is due to
the citizen that electric companiés that are permitted to
use for their own purposes the streets of a city or town
shall be required to exercise the utmost degree of care
in the construction, inspection and repair of their wires
and poles, to the end that travelers along the highway
may not be injured by their appliances.   The danger is
great, and  care  and  watchfulness  must be commen-
surate to it.   Passengers on railroad trains have a right
to expect and require the exercise by the carrier of the
utmost care, so far as human skill and foresight can go,
for the reason that a neglect of duty in such case is
likely to  result in  great  bodily harm  and sometimes
death to those who are compelled to use that means of
conveyance.   'As the result of the least negligence may
be of so fatal a nature, the duty of vigilance on the part
of the carrier requires the exercise of that amount of
care and skill in order to prevent accidents.'   (Ray on
Negligence, *supra*, page 53.)   All the reasons that sup-
port the rigid enforcement of this rigid rule against the
carrier of passengers by steam apply with double force
to those who are allowed to place above the streets of a
city wires charged with a deadly current of electricity
or liable to become so charged.   The requirement does
not carry with it too heavy a burden.   Human skill can
easily place wires and poles so that they will not break
and fall unless subjected to some strain that could not
be anticipated, and it can as readily prevent the possi-

bility, under ordinary circumstances, of the contact of wires that should not be allowed to touch one another."

The evidence in this case conduces to show that appellant was at work at his regular trade, and was where he had a right to be, and the joint of the wire being apparently insulated was to some extent at least a guaranty that there was no danger. But independent of that fact the situation of appellant, his work in hand and the proximity of the wire were such that he might without negligence have unthoughtedly taken hold of the wire, because he seemed to need support, and besides it was hardly to be expected that the current was on the wire at about noon, the wire being used wholly to supply incandescent lights or lamps.

It seems clear to us that appellee should have been required to have had perfect protection on its wire at the point and place where appellant was injured. The fact that it was very expensive or inconvenient is no excuse for such failure. Very great care might be sufficient as to the wires at points remote from public passways, buildings or places where persons need not go for work or business, but the rule should be different as to points where people have a right to go for work, business or pleasure. At the latter points or places the insulation or protection should be made perfect, and the utmost care used to keep it so.

Instructions Nos. 1, 2, 5 and 8, asked by appellant, should have been given. The others refused were not important, and tended to draw attention to particular facts or evidence. Such instructions are not favored in law.

It results from the foregoing views that the court erred in giving instructions numbers 1 and 2 marked as given.    The other instructions given by the court were not excepted to, hence need not be discussed.

For the errors indicated the judgment of the court below is reversed and cause remanded, with directions to set aside the verdict and judgment, and for a new trial upon principles consistent with this opinion.