MEMPHIS CONSOLIDATED GAS & ELECTRIC CO. v. LETSON.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1905.)

No. 1,356.

**1. ELECTRIC LIGHT COMPANIES—INJURY TO CUSTOMER—NEGLIGENCE—INFERENCE.**

Where a customer of an electric light company was killed, while turning on a light in the house, by the crossing of the primary and secondary wires at the transformer in the street, the jury, in the absence of explanation, may infer negligence from the happening of the accident, though the wires were properly installed, but the court is not required to say whether it should be presumed.

[Ed. Note.—For cases in point, see vol. 18, Cent. Dig. Electricity, § 11.]

**2. SAME—CONTRIBUTORY NEGLIGENCE.**

The question of what kind of a cord was connected with an electric light in a house, in turning on which a customer of the electric light company was killed, is immaterial on the question of contributory negligence, where any kind of a cord that might have been used could not have prevented the accident.

**3. WRONGFUL DEATH—DAMAGES—EVIDENCE OF EARNING CAPACITY.**

In the absence of better evidence as to the earning capacity of deceased, in an action for negligent killing, evidence of what he spent on his family is admissible, though this may be overcome by evidence that he derived it otherwise than from his earnings.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, § 88.]

**4. SAME—INSTRUCTION.**

An instruction, in an action for the damages resulting to the widow and children of deceased from his death, as authorized by the statutes of Tennessee, *held* to keep within the rules and fairly set forth the elements to be considered, as determined by the Supreme Court of that state in construing such statutes.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

E. E. Wright, for plaintiff in error.

Bell, Terry & Bell, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. On May 19, 1903, J. J. Letson, a resident of Memphis, Tenn., was instantly killed by an electric shock received while turning on a 16 candle power incandescent lamp in the basement of his house. The lamp was a portable one, being attached to a cord. The deceased had been, since September 7, 1901, a patron of the Memphis Consolidated Gas & Electric Company, which had contracted to furnish him, for illuminating purposes, with a current of 104 volts to supply twenty 16 candle power incandescent lamps. Such a current is not regarded as dangerous to human life. Under the method in use, this harmless current was obtained by passing the initial dangerous current of approximately 2,300 volts from the primary wire into a transformer located on a pole in the street near Mr. Letson's house, where it was reduced to 104 volts and transmitted into the residence by the secondary wire. An examination made shortly after the accident disclosed the fact that the primary wire had become crossed

with the secondary wire on the outside of the transformer, the insulation had worn off, an electrical contact or "cross" had been established, and the current of approximately 2,300 volts was being transmitted directly into the residence without passing through the transformer at all. This current was of such deadly intensity that no method of insulation ordinarily used in residences would protect one attempting to use it for lighting purposes. Mr. Letson, having occasion to use the lamp, seized it at the socket and turned the button, and the current passed through his body, killing him instantly. A neighbor who was present and attempted to release him was shocked and slightly burned. The suit was brought under the Tennessee statute by the widow, on behalf of herself and infant son. The electric company was charged with negligence in permitting the deadly current to pass into the residence of the deceased. The jury returned a verdict for $13,750. We shall consider such of the assignments of error as seem material. They may be grouped under three heads: First, those relating to the charge of negligence, and the nature of the proof required to sustain it; second, those growing out of the defense of contributory negligence; and, third, those concerning the measure of damages.

1. The declaration charged the defendant in three counts with negligence in permitting a dangerous and deadly current of electricity to pass into the house of the plaintiff's intestate: First, by negligently installing its wires (in connection with the transformer) and defectively insulating them, so that the primary and secondary wires were permitted to come into contact; second, by so negligently conducting its electric light plant as to permit such current to so pass; and, third, by so negligently conducting itself that, by means of defective wiring, insulation, and apparatus, it permitted such current to so pass. The defendant denied any negligence, averring that the accident was due to the negligence of the plaintiff's intestate. The testimony of the plaintiff conclusively showed that the cause of the accident was the contact or "cross" between the primary and secondary wires, and tended to show that this was due to the defective installation of the transformer, the wires being improperly located with reference to one another, and one left so loose that it naturally crossed the other. The defendant attempted to meet this by showing it had installed the transformer in the usual and proper way, that used by other electric light companies and regarded by experts as safe; but here it stopped. Conceding that the "cross" existed, it made no effort to explain how it happened, or to show that some cause for which it was not responsible had brought about the contact. Obviously, the "cross" was in itself a negligent condition of the wires, because it exposed customers within reach to the risk of serious, and probably fatal, injury. Such being the nature of the testimony, the court charged the jury as follows:

"You may also and you should look at the fact that the accident occurred, the fact that the wires confessedly did come together, and cause this accident, as the fact and circumstance in this case in determining whether there was any negligence. It is not sufficient in itself— Well, I don't say that— It is for you to say whether or not, from the nature and character of this accident, from the nature and character of these structures, from the condition and circumstances that surrounded the particular cause of happening of the accident, was, of itself, sufficient to infer negligence in the original

structure. It may or may not. It is a question for the jury to determine, and you are to look at the happening of the accident as a fact in the case, just as you look at all the other facts, the opinion of the expert witnesses, the description of the structure by the people who made it, the description as it was found at the time of the accident and immediately afterwards, and you are to take the fact that the accident did happen, along with all the other facts and circumstances, and say whether or not it is a proper and reasonable inference to draw from the accident itself that it was negligently constructed, or whether the accident was of such a character that the contact might have taken place without any negligence in the original construction and maintenance of the wire.

"Now, I am going to illustrate that point to you by telling you of an experience of my own in relation to this question. I was sitting on the same bench in the trial of a case with Mr. Justice Brown, now of the Supreme Court of the United States, when he was a district judge, and the question came up as to when a jury, or a trier of the facts, or a court, in submitting a question to the jury, would be forced to infer from the accident itself that there had been negligence, and illustration was made of two railroad trains upon a single track coming into collision. I made the suggestion that that was of itself conclusive evidence of the fact that there was negligence somewhere for which the company was liable to the passengers; that two trains could not come into collision on the track of a railroad company without negligence on the part of the company somewhere, no matter whether we know where it was or not. Mr. Justice Brown said he did not agree to that, because he said some third party might come and throw a switch in such a way that the company would not be liable for it. That is one way it might happen. There might be such a structure of the grades that a train might get away without negligence on the part of the company, and might run away and go downgrade and go on the track and make it, and he went on to suggest certain contingencies that might happen that would show that it was not a conclusive evidence of negligence that the collision had taken place. Now, we had that suggestion here by one of the witnesses in relation to this accident. He said somebody might have climbed on this pole and put his wires together, and it is not impossible to imagine that some enemy of Letson that wanted to kill him might go up there and put them together just for the very purpose of killing him. But, gentlemen of the jury, you are not to determine the question from mere imagination of what might have been done. There must be in the proof itself some suggestion of such a contingency as would relieve the inference of negligence that you might otherwise draw from the happening of the accident itself.

"It is the duty of the defendant company, where an accident happens from which the jury would be forced to infer negligence, it is the duty of the defendant company to show to you such facts and circumstances as would show that, notwithstanding that negligence, notwithstanding that inference, there was in this particular case such circumstances as would relieve the accident of the inference that you would otherwise draw about the negligence. I don't mean that the burden of proof is on the defendant company to show that it was guiltless of negligence; that is not what I mean. The burden is on the plaintiff to show that it was guilty of negligence; but you, in determining this question, as to how much importance you are to attach to the accident itself as proof of the negligence, you are to look at whether or not the facts and circumstances of the case have shown anything to indicate that the accident could have happened without negligence; for instance, if a great storm had been shown, a cyclone, or a wind blowing that had disarranged these wires, that had disarranged the cross-arms, that had brought the poles and structures together through some violent, through some extraordinary and unusual, wind and storm, and things like that. If that was indicated in this proof, you would be justified in saying that the happening of the accident didn't indicate it."

The charge is criticised, first, because it applies the rule of res ipsa loquitur, and, second, because it does not, but leaves the jury free to do as it sees fit—apply the rule or not. It is urged that the rule is not

applicable, but if it is, the court must say so, and not leave the matter to the jury. This criticism does not appeal to us. We think the court dealt generously with the defendant. No rigid rule of presumptive guilt was applied, but after the inferences naturally to be drawn from certain facts had been explained, the jury was left free to determine, from all the circumstances of the case, whether the defendant had been guilty of negligence or not. This was not a case where the court was obliged to say whether, from the mere fact of the accident, negligence should be presumed. In Kearney v. London, etc., Ry. Co., L. R. 6 Q. B. 759, it was held that negligence might be inferred from the fact that a brick fell from the pier of a railroad bridge without any assignable cause. The brick struck and injured the plaintiff, who was passing along a highway underneath the bridge. This presumption was based upon the duty of the railroad company to keep the bridge in repair, and to inspect it from time to time to ascertain whether the brick work was secure. But, in the present case, the cause of the "fall of the brick" is shown. It was the "cross" between the wires that sent the deadly current into the house. The wires were out of repair. The contention of the company amounts to this: that if the wires were properly installed it cannot be held responsible for their being out of repair, unless it is proved they got out of repair through its fault. But this loses sight of the duty of the company not only to make the wires safe at the start, but to keep them so. They must not only be put in order, but kept in order. The obligation is a continuing one. The safety of patrons and public permits no intermission. Constant oversight and repair are required and must be furnished. Customers who contract for a harmless current to light their houses are entitled to rely on such inspection and repair as will effectually guard them against a dangerous current. They cannot guard themselves. Any attempt to do so would expose them to immediate peril. They must take and use the current on trust, relying upon the protection of the company. In view of this, when a deadly current enters a customer's house and kills him, it is not too much to call upon the company to explain the existence of the defect which caused the tragedy. If attributable to some force which the company could not foresee and guard against, it should not be held culpable. But an unexplained defect is a blamable one. A company which, for purposes of gain, creates or carries a deadly current, must take care of it, and if it gets away because the wires are out of order, and enters a residence and kills a customer without any fault on his part, negligence is presumed, and the company is bound to exculpate itself. Griffin v. United Electric Light Co., 164 Mass. 492, 41 N. E. 675, 32 L. R. A. 400, 49 Am. St. Rep. 477; Clarke v. Nassau Electric R. Co. (Sup.) 41 N. Y. Supp. 78; Dwyer v. Buffalo General Electric Co. (Sup.) 46 N. Y. Supp. 874; Wolpers v. Electric Light & Power Co. (Sup.) 86 N. Y. Supp. 845; Fitzgerald v. Edison Electric Co., 200 Pa. 540, 50 Atl. 161, 86 Am. St. Rep. 732; Snyder v. Wheeling Electrical Co., 43 W. Va. 661, 28 S. E. 733, 39 L. R. A. 499, 64 Am. St. Rep. 922; Thomas v. Electrical Co., 54 W. Va. 395, 46 S. E. 217; Haynes v. Gas Co., 114 N. C. 203, 19 S. E. 344, 26 L. R. A. 810, 41 Am. St. Rep. 786; Clements v. Electric Light Co., 44 La. Ann. 695, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348; Hebert

v. Lake Charles, etc., Waterworks Co. (La. 1903) 35 South. 731, 64 L. R. A. 101; Denver Electric Co. v. Lawrence, 31 Colo. 301, 73 Pac. 39; McLaughlin v. Louisville Electric Light Co., 100 Ky. 173, 37 S. W. 851, 34 L. R. A. 812; City of Owensboro v. Knox's Adm'r, 76 S. W. 191, 25 Ky. Law Rep. 680; Gilbert v. Duluth General Electric Co. (Minn. 1904) 100 N. W. 653; Newark Electric Light & Power Co. v. Garden, 78 Fed. 74, 23 C. C. A. 649, 37 L. R. A. 725; May v. Burdette, 9 Q. B. R. 101; Fletcher v. Rylands, L. R. 1 Ex. 265, 279; Scott v. Docks Co., 3 Hurl. & C. 596; Kearney v. London, etc., Ry. Co., L. R. 6 Q. B. 759, 762.

2. The defendant contended that the plaintiff's intestate was guilty of contributory negligence in using, in connection with the portable lamp which he was turning on when killed, a cord such as is ordinarily used in residences for pendent lights, and which had not been inspected before the current was turned on. The current was turned on September 7, 1901, and the accident occurred May 19, 1903. The inspection of fixtures was made by one Cleary. The testimony was conflicting upon the point whether this portable light was inspected or not, and the court submitted the question to the jury. Cleary testified, under objection, that the kind of cord used on this lamp was in common use in Memphis for that purpose. It was conceded that it would carry safely a current of 104 volts, which was all that was contracted for, and, anyhow, the testimony was all to the effect that such a current was harmless to human life. The proof also made it clear that, no matter what kind of cord had been used, the current of 2,300 volts would have been fatal to Mr. Letson when he grasped the lamp the way he did and turned on the light. In view of this, the action of the court relied on for reversal (if it was erroneous, which it is unnecessary to determine) could have had no effect upon the verdict, and hence was harmless.

In Denver Electric Co. v. Lawrence, 31 Colo. 301, 73 Pac. 39, a young man, while turning on an incandescent light in his father's house, received a shock which seriously injured him. This resulted from a defect in the transformer, whereby a dangerous current was carried into the house. Respecting the effort of the company to show that the plaintiff turned on the light improperly, and thus by his negligence contributed to his injury, the court said (page 307, 31 Colo., page 39, 73 Pac.):

"The fact that the interior fixtures may have been out of repair cannot relieve the company of the responsibility it owes to the public, and owed to the plaintiff, to not permit a deadly current of electricity to enter the house, if within its power to prevent.

In Gilbert v. Duluth General Electric Co. (Minn. 1904), 100 N. W. 653, the plaintiff's intestate was killed while turning on an electric light in his bathroom. His death was caused by an excessive current which entered the house by a "cross" between the primary and secondary wires, so the case was similar to that before us. Respecting the contention that the house fixtures were defective, and therefore the deceased was guilty of contributory negligence, the court said:

"We are of the opinion this contention cannot be sustained. House fixtures are not constructed with a view of connecting wires with death-dealing cur-

rents. It appears from the record secondary wires ordinarily carry a voltage of but 100, or one-fifth the amount of a deadly current, and one twenty-second part of the voltage which the evidence tends to show passed over the wire in question and through the body of the deceased. The deceased was not an electrical expert, and, unlike appellant, he was not engaged in a business which charged him with special knowledge in the premises. We cannot say he was guilty of negligence in not anticipating that primary and secondary wires might become crossed in the streets, and that it was his duty to take precautions to guard against danger therefrom."

Under the charge, which it is unnecessary to quote, the jury may have found either that the cord had been inspected and approved, or, if not, that it would have made no difference whether it or another kind of cord was in use; in other words, that the nature of the fixture had nothing to do with the accident; that the deadly current would have killed Mr. Letson when he came in contact with the brass cap of the lamp, no matter what kind of cord was attached.

3. The remaining assignments relate to the testimony admitted and the charge given respecting the measure of damages. The deceased was a contractor, 39 years old, of good habits, industrious, devoted to his family, and what is called a "good provider." He left a widow, and a son about nine years old. No witness was introduced who was able to state just what his income was, but testimony was admitted tending to show his occupation, his industry, and his mode of life, from which it appears that he was in the habit of spending on his family between $2,000 and $2,500 a year. It is urged this was error, but we do not think so. The testimony was admitted in default of better proof of his earning capacity. If a man's income is limited to his earnings, if he spends only what he earns, then, when you show what he spends, you furnish data for estimating what he earns, and that was what was done, and the best that could be done, in this case.

Many exceptions were taken to the charge of the court. It was not brief, neither is counsel's criticism. We have carefully read and considered both. It seems that the Supreme Court of Tennessee has not always been consistent in its construction of the statutes regulating actions of this kind. From time to time it has modified and altered its views; so it was deemed necessary, in the recent case of Davidson v. Severson, 109 Tenn. 572, 72 S. W. 967, to review elaborately its many decisions, for the purpose of ascertaining and stating clearly and concisely what the law now is. Counsel agree that the court below differed from both of them in a view he expressed of the nature of the action, but counsel for the plaintiff below insists the error was favorable to the defendant. We agree to this. It is unnecessary to repeat all that was said generally on the subject of damages. The material inquiry is whether the court laid down the right rules for the guidance of the jury, correctly stating the elements of damage to be considered. We think the charge, taken as a whole, stated the law properly, with entire fairness to the defendant. Portions which, detached from the context, might seem to be misleading, are qualified or corrected by what succeeds. Thus, early in the charge, the court made a quotation from the case of Baltimore & Potomac Railroad Co. v. Mackey, 157 U. S. 72, 93, 15 Sup. Ct. 491, 39 L. Ed. 624, which the defendant below insists amounted to an instruction that the jury might consider the de-

pendence of the beneficiaries on the deceased, for the purpose of en-
hancing the damages. But later, when the court came to lay down the
rules, the jury was pointedly instructed that the plaintiff and her son
were only entitled "to such a fair and temperate sum of money as
would compensate them for the loss of the husband and the father."
All sentimental considerations were carefully excluded, and the jury
was restricted to an estimate of a pecuniary compensation for the
pecuniary loss they had sustained. Under the Tennessee statute, the
widow and son were entitled to recover the damages resulting to them
from the death of the husband and father. The measure of this was
the value to them of the life lost. Estimated in money, it was what
his life was worth as a prospective producer of money, and, under the
charge as given, it was worth no more in that sense to the widow and
son than it would have been to the estate; indeed, if anything, it was
worth less. Counsel for the plaintiff in error, after quoting the rules
laid down in Davidson v. Severson, says:

"The rules referred to for the determination of the pecuniary loss to the
widow and children embrace only the pecuniary value of the life of the de-
ceased, to be determined upon the consideration of his expectancy of life, his
age and condition of health and strength, his capacity for earning money
through skill in art, trade, profession, occupation, and business, and his per-
sonal habits as to sobriety and industry; all modified, however, by the fact
that the expectancy of life is at most only a probability based upon experience,
and also by the fact that the earnings of the same individual are not always
uniform."

Conceding this to be a fair summary of the law as it stands, we con-
tent ourselves, for purpose of comparison, with quoting the language
complained of, believing it kept well within the rules and fairly set
forth the elements to be considered:

"Obviously there are no such scales with which a jury may measure the dam-
ages to a widow and son for the loss of the husband and father. Sentimentally
considered, and if you were allowed to fix any damages to assuage their mental
sufferings by reason of the loss, there is not money enough in the banks to pay
such damages. But the law does not allow you to proceed upon any such
theory. It is simply a pecuniary compensation for the pecuniary loss they
have sustained. But the jury is not left without some guidance of facts to
enable them to determine what would be fair, reasonable, and temperate com-
pensation. There is the age of the plaintiff to begin with. The law does not
allow you to take a pencil and tablet and calculate by multiplication the
amount of his yearly income by the number of years of his expectancy. Now
the proof here is that this man was 39 years old, and you, as men of ordinary
affairs, will know about how long a man 39 years old may be expected to
live. Now it would be quite an easy thing, if Mr. Letson was satisfactorily
proved to have earned $2,000 or $2,500 a year, to take a tablet and set down
and count up how many years he had left of his life expectancy, and multiply
that by 2,000, and find that sum of money. But obviously that is not just, be-
cause Mr. Letson may sometimes not earn his $2,000. He may be sick some-
times. As he grows old he may have less earning capacity, and there are
thousands and thousands of contingencies that come up which will make it
utterly impossible for you to say that he will uniformly during that whole
time earn $2,000 or $2,500 a year; and therefore the law does not allow you
to start out with a calculation of that kind, any more than it allows you to
sit down and say, each one of you, how much you think he ought to have, and
add it together and divide it by 12. That is a mathematical calculation that
the law does not allow because it is a mathematical calculation, because the
nature of the case is such that you cannot very well set down and find on one
side the debit and on the other side the credit, and render a verdict accord-

ingly. 'You can't, from the nature of the circumstances and inquiry, determine what you are to start with on one side, and what you are to deduct on the other side; and therefore the law only allows you to look at this question of damage and expectancy as a substantive fact in the case, to see what kind of man he was, whether young or old, and what was the value of that particular man in life. And then it allows you to look at his earning capacity in the same way. What was his capacity in business? what kind of money did he earn? and what kind of man was he about earning money? so as to determine, the best you may, the value of his particular life to his widow and son. Such multiplication as that does not afford, and the jury is not allowed to use it as, a basis of their calculations at all, for the reason that it is impossible, on the other side, to estimate by calculation any deductions for loss of time at work, by sickness, or any contingencies of human life, that prevent a man from earning every day of his life all that his earning capacity would justify. Therefore it is that all the use you can make of the expectancy is that a man of Mr. Letson's age would live about 29 or 30 years. Of course, if he were older or if he were younger, other conditions being equal, you could not give the widow and children of an old man who was nearer the grave the same sum of money that you would a younger man. Next, the Supreme Court of the United States mentions the man's health, which, of course, is an important element in the proof, as an unhealthy and sickly man's life would not be worth as much to the widow and children in a pecuniary sense as the life of one who was in good health. The next is the element of his strength and his capacity to earn money. You take into consideration the man's earning capacity. In determining that, of course, the amount of money that he does earn, if it is in proof before you, is an important element of consideration; but it is not necessary that he should show a fixed income in order to show an earning capacity. It is what he is capable of earning that enters into the calculation, rather than what he actually earns in fact. What he actually earns in fact may be a demonstration of his earning capacity, and yet it may be more than he actually earns. It is not impossible that his fair and reasonable earning capacity might be less than he earns, in fact, under exceptional circumstances— such as favoritism, for instance. So the jury looks to the man's strength and earning capacity as an element in their calculation. In determining this question, you may look at any fact or circumstance in the proof that tends to show what it was. Some objection has been made in this case that no earning capacity has been shown except by showing the mode of living, and it is said that the man may have been living on other people's money and not on his earnings, because it is said that he had recently gone through the bankruptcy court, showing that he was a man who had been in debt. All these circumstances you are to consider for what they may be worth in your opinion in determining what the man's earning capacity was to support his wife and children. If he did, as a matter of fact, support his wife and children in a particular style, you may consider that fact in determining what his earning capacity was. If you should see that he got the money from other sources than from his own efforts and his own earnings or income, that would be a matter also to be determined. But in the absence of proof that he had other sources of income from which to support his family, you would be authorized, I should think, to infer from the fact that he supported his family in a particular style that his earning capacity was equal to that task, in making this estimate of damages to be allowed his widow and son. Certainly what they have lost by his death is that which they received through his life. And, then, you may look to his family, in its condition of dependence upon him, if such was a fact. So, gentlemen of the jury, you look to all the facts and circumstances in this man's condition, such as those which have been indicated, and similar circumstances that may appear in the proof, whatever they are, and estimate, as best you may, the value of the man's life to his widow and son."

The judgment is affirmed.