## NEWARK ELECTRIC LIGHT & POWER CO. v. GARDEN.

(Circuit Court of Appeals, Third Circuit. November 30, 1896.)

### No. 9.

ELECTRICITY—NEGLIGENCE—SAFE INSULATION.

> An electric light company, which maintains wires carrying an electric current of high power on poles used, in common with it, by other companies for the support of their wires, owes to an employé of one of such other companies, who is lawfully upon the pole, in pursuance of the common right, the duty of exercising ordinary care to keep its wires so safely insulated as to prevent injury to such employé, though, in the performance of his work, he may enter upon a separate cross arm of the electric light company, or accidentally touch its wires. Acheson, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of New Jersey.

John O. H. Pitney, for plaintiff in error.

Aaron V. Dawes, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

DALLAS, Circuit Judge. This action was brought in the circuit court for the district of New Jersey by the administrator of the estate of James A. Mason against the Newark Electric Light & Power Company, for causing, by its negligence, the death of Mason. There were a verdict and a judgment for the plaintiff, and thereupon the defendant sued out this writ of error. The usual defenses were set up in the court below. Negligence on the part of the defendant was denied, and contributory negligence on the part of the deceased was asserted; but upon these subjects, considered separately and apart from the fundamental question, to be presently dealt with, the majority of the court has experienced no difficulty.

There is no specific criterion of care which could have been applied in this case. Neither the defendant nor Mason disregarded any determinate provision of the law prescribing what the conduct of either of them should have been, for there is no such provision.

The only rule which they, respectively, were bound to obey, is the general one which enjoins the exercise of due care,—the observance of such caution as, under the circumstances, an ordinarily prudent man would have observed. Whether either of them failed to perform this indistinctly defined obligation, assuming its existence on the part of the defendant, was a question of fact and of inference. The facts were controverted, the inference was disputed, and the evidence was not conclusive. Therefore, unless the case should have been entirely withdrawn from the jury, upon the underlying question about to be considered, no error was committed in submitting to it the issue as to negligence, both as respected the defendant and the plaintiff's intestate. The specifications, other than the third, which will be especially referred to, need not be further discussed. Although the charge of the court is, perhaps, open to some criticism, it exhibits no reversible error, if not upon the one important and quite distinctive subject to which attention is now to be directed.

There is no liability for negligence where there is no duty of care. Consequently, a plaintiff who grounds his action upon an allegation of negligence by the defendant must show, not only that the conduct of which he complains was negligent in character, but also that it was violative of some duty which was owing to him. That the conduct of this defendant was not careful, and that its lack of care, and not any negligence of Mason himself, was the cause of the death of the latter is established by the verdict; but, as we have said, the whole subject of negligence was inconsequent if, under the law and the evidence, the defendant was under no obligation to regard Mason's safety. The primary, separate, and controlling question upon this record, therefore, is: Was the defendant bound to exercise care—"ordinary care," as the court below held—to provide against the occurrence of such a calamity as befell Mason? That this inquiry may be intelligently answered, it is requisite that our investigation of the law should be based upon a correct conception of the facts to which it is to be applied; and those which are pertinent to this particular subject may be briefly stated.

The Western Union Telegraph Company was the owner of a certain telegraph pole, upon which the Pennsylvania Railroad Company rightfully maintained several electric wires, immediately supported upon three cross arms. The defendant company, also rightfully, maintained two wires, supported, one on either side of the same pole, upon a single cross arm. How this right, in either case, was acquired, is unimportant. There is no doubt that, in both, it existed, and that, in fact, the pole was lawfully used, not only by its owner, the telegraph company, and by a certain telephone company, but also by the railroad company and by the defendant. There were 12 cross arms in all, including the two temporary ones hereafter mentioned. The lowest was that which sustained the wires of the defendant, and above, at a distance of several feet, was one of those upon which were the wires of the railroad company. In the space between these two bars were those in use by the telephone company, and below the latter, and above that of the defendant company, two new ones were inserted by the railroad company, to facilitate the

.transfer of its wires; and Mason was one of several men employed by that company, who, upon the occasion in question, were engaged in making that transfer, which consisted in removing its wires from the poles of the telegraph company (including the pole which has been specified) to certain other poles, which belonged to the railroad company itself. Mason ascended this pole, and placed himself finally—what he had previously done is immaterial—in the situation which he occupied when he met his death. His right foot was upon one side of the cross bar, on which there was an electric wire of the defendant. This foot, however, was not, and did not become, in contact with the wire. It rested at a point sufficiently removed from it to be free from danger. In point of fact, the accident did not result from the position of his right foot, for the fatal connection was made through his left foot, which was thrown over the next bar above, the lower of the two new bars, and was "dangling down towards the lower bar," the one upon which was the defendant's wire. While in the position described, a telephone wire was handed to Mason by a fellow workman, and in reaching out to grasp it, his pendent left leg was naturally, perhaps necessarily, extended towards the wire of the defendant, and, in consequence, his left foot either touched it. or came so near to it that, by reason of the thus electrically connected interposition of his body between that wire and the telephone wire, which he had seized in his left hand, he was subjected to the shock which killed him.[1] The defendant's wire was a large one, and was highly charged. It was insulated, but the insulation was defective, and but for its exposed condition at one minute point this disaster would not have happened.

If, in view of the facts which have been narrated, it could be unqualifiedly asserted that, at the time and place of the accident, Mason was wrongfully upon the separate property of the defendant, and if nothing but that bare fact should be regarded, but one conclusion could be reached; for the law is well settled that, in general,

[1] NOTE BY THE COURT. This statement of the situation of Mason is taken, substantially, from the charge of the court below, in which it was said: "While so employed, suddenly, and without warning, he gave a groan. His body was convulsively twitched, then rigidly straightened out. His right foot was upon the lower cross bar on which were the electric wires. His left foot was thrown over the next bar above, and was dangling down towards the lower bar. His right arm was around the pin on the third cross bar, and in his left hand he had grasped a wire, known as a 'telephone wire,' which had been handed to him by a fellow workman."

There is, it is true, some evidence which, standing alone, would seem to be to the effect that Mason was, though astride of the bar next above, wholly resting upon the bar used by the defendants; but, taken as a whole, we think it shows that one of his feet was, and must have been, "dangling," as described by the learned judge, at the time when he received the shock. He was in the act of reaching out, and naturally, we think, must have had one of his legs extended in a direction opposite to that in which he was reaching. To quote the language of several of the witnesses: "He stood in this shape, one arm between his legs, and he was reaching out to the extreme end of the arm. Q. No. 2 arm? A. No. 3. Q. He had his leg over No. 2, his foot on No. 1, and he reached over to No. 3 to make a fastening at that point? A. Yes, sir. * * * He was standing on the arm this way [illustrating], and another arm between his legs, and reaching out to fasten it to the end of the arm. * * * He had to reach

the right to keep his own property in such condition as the owner may see fit is not restricted by any requirement to guard against its causing injury to one who, without invitation, actual or apparent, but as a bare volunteer or mere trespasser, intrudes upon it. This limitation of the principle that no person may lawfully use even that which is his own so as to do hurt to another is, however, not controlling in all cases; and the duty of care, which the law imposes upon those who undertake to operate so dangerous a force as electricity, may, under some circumstances, be due to one who, technically, is a trespasser. In such a case as this one, its special facts are for consideration, and upon them, and not solely with reference to the ownership or occupancy of the locus in quo, the question of duty must be determined. "It is true that, where no duty is owed, no liability arises. * * * But, as has often been said, duties arise out of circumstances. Hence, where the owner has reason to apprehend danger, owing to the peculiar situation of his property, and its openness to accident, the rule will vary." Hydraulic Co. v. Orr, 83 Pa. St. 332. It makes no difference, where the circumstances give rise to duty, that the plaintiff was "technically a trespasser." Schilling v. Abernethy, 112 Pa. St. 437, 3 Atl. 792. The true question is: Was he "a trespasser there, in a sense that would excuse the defendant for the acts of negligence, * * * whether the owner or occupant of premises is liable under any circumstances, and, if so, under what circumstances, for injuries received by a person while on such premises, and by reason of their dangerous condition"?

In Railway Co. v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619, the question was thus stated, and, in answering it, the supreme court held that, under the circumstances of that case, the person injured could not be regarded "as a mere trespasser, for whose safety and protection, while on the premises in question, against the unseen danger referred to, the railroad company was under no duty or obligation whatever to make provision." The fact that, in all these cases,

out on account of this bottom arm was a six-foot arm, and the other arm a ten-foot arm, and he had to reach out about a foot. * * * His left foot was behind his right foot, and sometimes would be on the bar and sometimes would not." It is obvious that this testimony could be exactly comprehended only by one in whose presence it was given; and to such a one, no doubt, it was made perfectly clear by the illustrative movements of the witnesses. Therefore, we have accepted that understanding of it which the learned judge who heard it, without intimation of doubt on his own part, or of objection from either party, assumed to be the correct one. Indeed, the brief of the plaintiff in error presents the matter in a manner not materially different, viz.:

"At the time of the accident Mason was standing on defendant's cross arm on the north side of the pole facing west, his legs astride the next cross arm above, his right foot resting on defendant's cross arm, his left foot also touching it, or swinging free in the air, as his body moved. While in that position, the telephone wire was handed to him, which he took in his right hand, and was apparently about to adjust to the outermost pin on the third cross arm. As he did so his left foot came in contact with defendant's wire, and from that received, apparently, an electric shock through his body, connection presumably being made through the telephone wire in his hand."

It has been thought desirable that this note should be made, in order that it may not be supposed that the evidence on this subject has not been fully considered,—not because it is deemed to be of vital importance, for it is not.

the courts gave due weight to the circumstance that, in each of them, the person injured was a child, would not justify us in restricting the application of the principle upon which they were decided to cases which present the same peculiarity. The doctrine of all of them is that a duty of care may, by reason of the circumstances, be due from the owner of property to one who is technically a tresspasser upon it; and the youth of those most likely to suffer from a failure to discharge such duty is simply one of the circumstances which, when present, is to be considered with the rest. The opinion of the court in the case last cited cannot be read without perceiving that the matter was so viewed by the supreme court of the United States; and the supreme court of Pennsylvania, by which the two cases first cited were decided, has repeatedly held that a child may be such a trespasser as to be subject to the consequence of his trespass. It has never laid down one rule with respect to children and another respecting adults, but has many times said that the former, like the latter, when trespassers "in every sense of the word," are to be regarded as wrongdoers, to whom the owner of the premises is under no obligation. Rodgers v. Lees, 140 Pa. St. 475, 21 Atl. 399; Mitchell v. Railroad Co., 132 Pa. St. 226, 19 Atl. 28.

It is only by liberally construing the assignment of errors that any of the specifications can be taken to raise the particular question with which we are now dealing. But two of them can be said to present it, even by implication. These are:

"(2) That, the plaintiff having rested his case, the defendant's counsel moved for a nonsuit on the ground that no sufficient negligence on the part of the defendant had been shown to maintain the action, and also on the ground of contributory negligence on the part of the plaintiff's intestate, which motion was overruled. (3) That, upon the completion of the evidence in the case, the counsel of the defendant renewed his motion for a nonsuit, and moved for a direction of a verdict for the defendant, upon the same grounds as stated in the former motion, which motion was overruled."

The refusal to nonsuit is not reviewable (Telegraph Co. v. Thorn, 12 C. C. A. 107, 64 Fed. 287); but the denial of the defendant's request for binding instructions is, and, that the plaintiff in error may have the utmost advantage of his exception to that denial, we will consider this specification as if he had distinctly put his request that the case should be withdrawn from the jury upon the further ground that the evidence would not warrant a finding that there was such a duty of care resting upon the defendant as was requisite to the maintenance of the action. But still we do not think that the facts of this case would have warranted the learned judge in adopting such a course. The several occupants of this pole had, by virtue of the contract under which they jointly used it, a common interest that its use should not be environed with unnecessary danger. Each of them owed the duty to take all reasonable precautions for the prevention of injury to the servants of any of the others, who might be sent there in pursuance of the common right; and we cannot agree that this duty was so circumscribed that it ceased to exist if any of these servants happened to rest his hand upon a cross bar, or, as in

this instance, to place his feet upon it.    It is by no means clear that the fact that Mason was partly upon the defendant's cross arm at all contributed to the result.    On the contrary, it is certain that he might have stood wholly upon it, at the point at which his right foot was placed, without incurring any hazard whatever, for at that point there was no wire; and his left foot might have been accidentally extended to it if he had been entirely upon the lower of the two new cross arms, or even upon the pole itself.

Apart from this, however, he was not a mere trespasser upon the cross arm of the defendant.    There was nothing in the surroundings to inform him that he ought not to go there, or that he would incur any risk if he did.    The wire was insulated, and the defect in its insulation was not readily discernible.    The cross arm, apparently, presented a safe footing, and, but for the defect in insulation, it was entirely safe to stand upon it.    Railway Co. v. McDonald, supra.    It may be conceded, as was decided by the supreme court of New Jersey, in Telephone Co. v. Speicher (not yet reported), that the defendant was not bound to make cross bars, intended for the purpose of supporting wires, of sufficient strength to support a man; but each case of this nature must be decided on its own facts, and in this one there is no question about the strength of the bar.    It was quite strong enough to sustain the weight which Mason put upon it. There was no risk involved but that which the presence of the wire created, and that was, apparently, provided against by insulation. So far as appeared, therefore, the bar was not dangerous; and, in placing himself where and as he did, this man was doing his work, as one of the witnesses said, "the same as any man would do it that works at the business"; and common sense and humanity demanded, as we think, that while so working his life should not have been put in jeopardy, we do not say by a trap, for there was no purpose to ensnare, but by an unknown and invisible peril, to which he might unconsciously or involuntarily be drawn, and from which, by taking ordinary care, the defendant might have protected him.    The defendant cannot be heard to say that it did not anticipate that the linemen of the other companies, as well as its own, would do their work in the way that is usual with them.    It was bound to know that they might come in contact with its wire; and that it did, in fact, assume the duty of providing against the occurrence of such casualties is shown by its having insulated the wire at all.    The fact that it was insulated was calculated to induce reliance upon its safety, and plainly tended to allure or entice such a man as Mason to go upon the bar on which it was stretched.    It offered an obvious, and, seemingly, a protected standing place.    "There was nothing to warn either child or adult that it was not to be so used." Schilling v. Abernethy, supra.    It was, therefore, "liable to the incursions of  *   *   *  even grown men," not "from thoughtlessness, accident, or curiosity," merely, as suggested in Hydraulic Co. v. Orr, supra, but in the prosecution of their legitimate calling.

Finally, and upon all the facts, we are of the opinion that, even upon the assumption that the plaintiff's decedent was technically

a trespasser, the defendant, under the circumstances, owed him a duty of at least ordinary care. We are not attempting to lay down a rule applicable to all cases; but the principle which, in our judgment, is controlling in the present one, is that any person who engages in a highly dangerous occupation is bound to take such precaution in its pursuit as a sensible man would ordinarily take to avoid doing fatal or other serious injury to one who comes upon his premises, not as a mere trespasser or positive wrongdoer, but for a purpose in itself lawful, and which the owner had reason to believe might bring him there. The judgment is affirmed.

ACHESON, Circuit Judge. I dissent from the opinion of the majority of the court, and from the judgment of affirmance. According to my reading of this record, the following stated facts are conclusively established by the evidence: James A. Mason was an experienced lineman in the employ of the Pennsylvania Railroad Company, and on the occasion when he lost his life was one of a gang of that company's linemen engaged in removing the railroad company's telegraph wires from an old line of poles owned by the Western Union Telegraph Company to a new parallel line of poles of the railroad company recently erected. One of the Western Union Telegraph Company's poles stood at the southeast corner of Hamilton street and Railroad avenue in the city of Newark. There were upon the pole 10 cross arms, all carrying wires. The topmost arm belonged to the city of Newark; the second, third, and fourth cross arms from the top belonged to the Western Union Telegraph Company; the fifth, sixth, and seventh cross arms from the top belonged to the Pennsylvania Railroad Company; the eighth and ninth cross arms from the top belonged to a telephone company; and the tenth from the top, or the bottom, cross arm belonged to the Newark Electric Light & Power Company, the defendant below. The bottom cross arm was a short arm, about four feet in length from end to end. The other cross arms were considerably longer. The distance from the defendant's cross arm to the lowest cross arm of the Pennsylvania Railroad Company could not have been less than six feet.

To facilitate the removal of the railroad company's wires to their new location, that company's linemen put upon the Western Union pole two long temporary cross arms above the defendant's cross arm, between it and the lower permanent cross arm of the telephone company; and, at the time Mason was killed, he and his fellow linemen were engaged in shifting the telephone wires from their own proper arms to the two temporary cross arms. In doing this work Mason stood upon the defendant's cross arm. Immediately before he received the fatal electric shock, his legs were a-straddle of the lower temporary telephone cross arm; but he stood with both his feet upon the defendant's cross arm. Corbet Aten, a witness for the plaintiff, in response to the question, "And before you heard that exclamation from Mason, and when you saw him have the telephone wire in one hand, where was he standing or sitting, or what was he doing?" answered, "Well, he was standing. He wasn't sitting. He

had one leg over the cross arm next above, you know, and both feet down on this arm, where the electric light wires was." And Samuel A. Powell, the foreman of the gang of linemen, a witness for the plaintiff, testified thus with respect to Mason's position:

"Q. Where did he stand? A. On the bottom arm. Q. Was that the arm where the electric wires were? A. Yes, sir. Q. And was that the point from which he could perform his work? A. Yes, sir. Q. The work which you appointed him to perform? A. Yes, sir. Q. And did he perform, or attempt to perform, his labor from that position, standing on that bottom cross arm? A. Yes, sir. Q. And where was he when he was killed? A. Well, he was astride of the arm,—one arm he had his left leg thrown over, the next to the bottom arm,—and of course that throwed his both feet on the bottom arm, the four-pin [arm], and he then, of course, was in between two wires, and he was working them to make a reach to the end of this ten-pin arm to put the wire onto the knob to make a fastening."

After Mason had gone up the pole, and while standing on the defendant's cross arm, he was warned by the foreman, Powell, and also by his fellow workmen, that the defendant's wires were carrying heavy currents of electricity, and were dangerous. Once Mason was observed to be actually standing on one of the defendant's wires, and was warned off by the foreman. He was repeatedly cautioned against the danger from the defendant's wires. All the foregoing appears from the testimony of the plaintiff's witnesses.

The catastrophe occurred in this wise, as these witnesses state: Three of the railroad company's linemen were on this particular Western Union pole, two of them above Mason. One of the two handed Mason a telephone wire to attach to the outermost knob of the upper temporary telephone cross arm; and Mason, having taken this wire in his right hand, which was ungloved and bare, stretched out his person so as to make the desired attachment, and, as he made this movement, his left foot came in contact with the end of the defendant's wire which was on that projection of the defendant's cross arm upon which Mason then stood, and thus he received the electric shock that killed him. The plaintiff's witnesses who afterwards examined the defendant's wire testified that there were "two bare points" at the end of the wire. It was shown by testimony which was not directly contradicted, and which practically was unshaken, that the defendant company, within 60 or 90 days before the disaster, had caused this part of its wire to be carefully and perfectly insulated in the usual and approved way. How and when the "two bare points" were made was not shown. No usage was proved, nor was positive testimony produced, tending to convict the defendant of negligence or want of due care in not causing its wire to be inspected in the short interval between the insulation, in February or March, and the date of this occurrence, in April.

In my opinion, upon the whole evidence, the defendant was entitled to a verdict, and the peremptory instruction in its favor, asked for, should have been given. Undoubtedly the Pennsylvania Railroad Company's linemen had the right to go up and down this Western Union pole, and, while they were in the exercise of this right, the defendant owed to them the duty of reasonable care to

78 F.—6

keep its wires safely insulated. It will be noted, however, that on this occasion the linemen went up the pole securely, and all except Mason came down in safety. Mason was not injured while in the exercise of his right of going up and coming down the pole. For his own convenience, without the license, express or implied, of the defendant, Mason saw fit to take possession of the defendant's cross arm, by standing on the same, and doing his work therefrom. His work was quite unusual, and such as the defendant had no reason to anticipate or provide against. The work he was engaged in involved the removal of all the Pennsylvania Railroad Company's wires to another line of poles, and this occasioned the shifting of the telephone company's wires from their proper cross arms to two temporary cross arms, which the railroad people improvised. Again, Mason was not only an experienced lineman, and as such presumably acquainted with the inherent danger in heavily charged electric wires, even when insulated, but on this occasion he was repeatedly warned of the danger. It is by no means an improbable supposition that the two minute bare spots at the end of the wire were caused by the action of Mason's boots, or the spurs with which he was equipped. But, however this may be, the indisputable fact remains that he voluntarily, without the invitation or license of the defendant, placed himself in a position of danger by standing upon, and doing extraordinary work from the defendant's cross arm. In thus acting, Mason was a volunteer, and assumed the risk of the calamity that overtook him. He was, indeed, a mere trespasser. In principle, this case, it seems to me, is not distinguishable from the case of Telephone Co. v. Speicher, wherein the supreme court of New Jersey held that a telephone company was not answerable to a lineman, in the employ of a city, who, in descending one of the company's poles, supported himself by one of the lower cross arms which was insufficient to sustain his weight.

In each of the cases (cited in the opinion of the majority of the court) of Hydraulic Co. v. Orr, 83 Pa. St. 332, Schilling v. Abernethy, 112 Pa. St. 437, 3 Atl. 792, and Railway Co. v. McDonald, 152 U. S. 262, 14 Sup. Ct. 619, the injured plaintiff was a child, and, moreover, the circumstances were very different from those which existed here. The defendant here had no reason to apprehend danger to linemen from the situation and condition of its property. In truth, the evidence, I think, demonstrates that the defendant had taken all reasonable care to insure the safety of linemen when ascending and descending this pole. It is my judgment that the defendant had performed its whole duty to Mason, and that it is neither legally nor morally responsible for his death.