# EUGENIA V. TROUT, Respondent, v. LACLEDE GASLIGHT COMPANY, Appellant.

### Springfield Court of Appeals, November 10, 1910.

1. **ELECTRICITY:** Master and Servant: Joint Use of Poles: Telephone Companies: Electric Light Companies: Injury to Servant. A telephone company and an electric light company used jointly the poles belonging to the lighting company for stringing their wires. While an employee of the telephone company was working on one of these poles, he came in contact with a live wire of high voltage, belonging to the electric light company, and because of insufficient insulation on this wire he was shocked and killed. *Held*, that in such case. each company is, with respect to the joint use of the pole to sustain their wires, charged with the same duty towards the employees of the other company, as towards its own employees, and is required to exercise the highest degree of care in insulating their high voltage wires, and in this case the electric light company was held liable for the death of the employee of the telephone company, on account of negligent failure to have its electric light wires properly insulated.

2. **NEGLIGENCE:** Contributory Negligence: Electricity: Injury to Lineman. While working near the top of a pole on which was strung electric light and telephone wires, and where he had been working all day, a lineman came in contact with a live electric light wire of high voltage and was killed. Deceased was an experienced lineman of many years service, and was familiar with the danger from the electric light wires. It was also shown that the live wire was near the deceased's hip, and that some three feet away from the pole the insulation on the wire was defective, and this could be seen on inspection. It did not appear, however, whether the deceased slipped and in falling grabbed the wire at the point of defective insulation, or whether he placed his hands at this point and fell from the shock. *Held*, that the burden of proving contributory negligence being upon defendant, it was required to show that deceased had been negligent in handling the wires, and that under the evidence in this case the question was for the jury.

3. **ELECTRICITY:** Negligence: Defective Insulation: Prima Facie Case. In a suit against an electric light company, for the death of plaintiff's decedent, grounded on negligence for failure to have its wires properly insulated, where it is shown that the insulation is defective, at a point where deceased had to work near the wire and come in contact with it, and that

he did come in contact with the wire at the point of defective insulation, a prima facie case is made and it is not necessary to go further and show the length of time such defect had existed and that the company had knowledge of such defect.

4. **NEGLIGENCE: Proximate Cause: Accident Combined With Negligence.** Where it appeared that a lineman, working on a pole among electric light and telephone wires, came in contact with an electric light wire, and because of insufficient insulation was shocked and killed, and the evidence showed that he may have accidentally slipped or fell, and grabbed the wire and had thus come in contact with the wire at the point of defective insulation. *Held*, that this did not relieve defendant of liability for its negligence, if the lineman at the time of falling was in the exercise of ordinary care.

5. **CONTRIBUTORY NEGLIGENCE: Presumption: Burden of Proof.** The law will not presume contributory negligence in the absence of evidence, as this is an affirmative defense, the proof of which rests upon defendant.

6. ———: **Electricity: Failure to Wear Rubber Gloves: Question for Jury.** A lineman, while working on a pole upon which were strung telephone and electric light wires, came in contact with an electric light wire of high voltage, at a point where the wire was insufficiently insulated, and was shocked and killed. It appeared that rubber boots and gloves had been furnished the workmen, and that deceased had such gloves in his outfit at the time he was killed. The evidence also showed that linemen seldom wore gloves, and only in cases of necessity; that it was hard for them to handle small wires on account of the gloves being heavy; and before deceased was shocked he had been tracing telephone wires. *Held*, that under all the evidence, it was a question for the jury to determine whether or not deceased had been guilty of contributory negligence for failure to have on rubber gloves at the time he was killed.

7. ———: **Failure to Inspect: Handling Wires Defectively Insulated.** A lineman, while working on a pole among electric light and telephone wires, came in contact with a live electric light wire at a point where the insulation was defective, and was killed from the shock. The defective insulation was about three feet from the pole, and the deceased from his position on the pole, could have seen the defect had he made an inspection. It also appeared that deceased was not the troubleman, nor inspector, and that even had he seen the defect, he might reasonably have supposed that he could do his work without coming in contact with the wire at the defective place. *Held*, that the question of his contributory negligence under the circumstances was for the jury.

8. ——: ——: **Exposure to Danger.** A lineman, working among live electric wires is only required in any event, to look for patent defects in any wire with which he is likely to come in contact. Ordinarily, he has a right to assume that the wires are properly insulated, and in order to constitute contributory negligence, it must be shown that he voluntarily and unnecessarily exposed himself to danger.

9. **NEGLIGENCE: Rule Stated.** There has been a want of ordinary care when under all the circumstances, and surroundings of the case, the person injured, or those whose negligence is imputable to him, did or omitted something which an ordinarily careful and prudent person would not have done or omitted.

10. ——: **Custom.** It is well settled that usage or custom cannot excuse negligence. In other words, though the act or omission was customary, or was performed in the usual or customary manner, it may be deemed negligence, if not up to the standard of reasonable care.

Appeal from St. Louis City Circuit Court.—*Hon. Chas. Claflin Allen,* Judge.

AFFIRMED.

*Percy Werner* for appellant.

(1) Under the evidence introduced by plaintiff, the deceased husband of plaintiff was, as a matter of law, guilty of contributory negligence; if, indeed, his negligence was not the sole cause of his death. In this: (a) That having been provided with rubber gloves and rubber boots, for the express purpose of protecting him from dangerous wires, he negligently failed to wear either the gloves or the boots. Junior v. Electric L. & P. Co., 127 Mo. 84; Wray v. Electric L. & W. P. Co., 68 Mo. App. 390; Roberts v. Telephone Co., 166 Mo. 380; Bradley v. Tea & Coffee Co., 213 Mo. 320; Yongue v. Railroad, 133 Mo. App. 158; Moore v. Railroad, 146 Mo. 582; Hurst v. Railroad, 163 Mo. 322; Bailey on Master and Servant, sec. 1123; Purcell v. Shoe Co., 187 Mo. 290; Smith v. Box

Co., 193 Mo. 715; Richardson v. Railroad, 123 S. W. 22; McManus v. Railroad, 118 Mo. App. 158; Whaley v. Coleman, 113 Mo. App. 600; Fore v. Railroad, 114 Mo. App. 556; Dunphy v. Stock Yards Co., 118 Mo. App. 519; Montgomery v. Railroad, 109 Mo. App. 93; Hart v. Lighting Co., 201 Pa. St. 236; Munn v. Mfg. Co., 94 Ill. App. 126; White v. Thomasville Co. (N. C.), 66 S. E. 210; Pierson v. Tel. Co. (Wis.), 123 N. W. 642; Gilbert v. Burlington & Co., 128 Fed. 539; Williams Cooperage Co. v. Headrick, 159 Fed. 680.    (b) That while the abrasion of the insulation on defendant's wire was open to observation, and would be detected by the most casual examination, Trout either failed to examine the wires, or, having examined them and discovered the abrasion, he nevertheless put himself in contact with the wire at the point of abrasion, and at the same time brought himself in contact with some other conductor so as to form a short circuit. In either case, his own negligence was the cause of his receiving the shock.    Franklin v. Railroad, 97 Mo. App. 482; Marshall v. Hay. Press Co., 69 Mo. App. 260; Pohlmann v. Car & Fdy. Co., 123 Mo. App. 228; Judge v. Electric Light Co., 21 R. I. 128, 23 R. I. 208; Geismann v. Missouri-Edison Elec. Co., 173 Mo. 675; Ryan v. Transit Co., 190 Mo. 635; Wormell v. Railroad, 79 Me. 405; Epperson v. Tel. Co., 155 Mo. 375; Memphis Elec. Co. v. Simpson (Tenn.), 109 S. W. 1157; Railroad v. Simmons, 107 Tenn. 392; Railroad v. Dorsey, 119 Ga. 363; Ft. Worth L. & P. Co. v. Moore (Tex.), 118 S. W. 736; Cincinnati Elec. Co. v. Archdeacon (Ohio), 88 N. E. 127; Bergin v. Telephone Co., 70 Conn. 54; Memphis Elec. Co. v. Simpson (Tenn.), 109 S. W. 1155.

*J. E. Turner* and *Jos. A. Wright* for respondent.

(1)    Plaintiff's deceased husband was not, at the time of his death, employed by or working for the defendant, and therefore there was no assumption of

risk on his part, hence the Junior case is not applicable to the one at bar.   Knolton v. Lighting Co., 117
Ia. 145; Illingsworth v. E. L. Co., 161 Mass. 583, 25
L. R. A. 552; Stevens v. G. & E. Co., 73 N. H. 159, 70
L. R. A. 119; Newark E. L. & P. Co. v. Garden, 78
Fed. 74, 37 L. R. A. 725; Perham v. Electric Co., 33
Ore. 451, 40 L. R. A. 799.   (2)   Where two companies
by agreement or otherwise, use the same poles upon
which to string their electric wires, they are joint users,
and each owes a duty to the employees of the other company using said pole, of using the highest degree of care
in insulating the wires that are heavily charged with a
current of electricity of high voltage, and in keeping
them so insulated, and if either of them fail so to do it
is negligence, and the one failing is liable for the injuries sustained by the employees of the other company; said employees not being trespassers or licensees,
but invitees or employees of a joint user.   Day v. L. P.
& I. Co., 136 Mo. App. 274; Zeihm v. Electric Co., 104
Md. 48; Brown v. Electric, 90 Md. 406; 2 Joice on Electric Law, par. 666.   A.   (3)   A person who, for private
gain or profit, sends a current of electricity, the most
dangerous agency known to man, out over the streets
and alleys in a city where persons have a right to
go, and where it is known they will go from time to time,
is bound to exercise the utmost care to prevent the escape of the electric current, and, if he fails so to do,
becomes liable.   Geisman v. Electric Co., 173 Mo. 654;
Winkleman v. Electric Light Co., 110 Mo. App. 184;
Gararandi v. Electric Imp. Co., 107 Cal. 120; Haynes v.
Gas Co., 114 N. C. 203; McLaughlin v. E. L. Co., 100
Ky. 173; Denver Electric Co. v. Simpson, 21 Colo. 371;
Leavenworth Coal Co. v. Ratchford, 5 Kan. App. 150;
Frauenthal v. Gas Light Co., 67 Mo. App. 1; Larsen v.
Railroad, 56 Ill. App. 263; 1 Thompson on Negligence
(2 Ed.), sec. 779.   (4)   A person using wires heavily
charged with electricity of high voltage and dangerous
to human life, is bound to use the utmost care in the in-

spection of said wires, and in keeping them free from defects, which duty he owes to all persons who have a right to go thereabouts, whether for business or pleasure. Griffin v. E. L. Co., 164 Mass. 492; Mitchell v. Light & Power Co., 45 S. C. 146; Cook v. Electric Co., 9 Houston (Del.), 306; Texarkana G. & E. Co. v. Orr, 59 Ark. 215; Leavenworth Coal Co. v. Ratchford, 5 Kan. App. 150; Atlantic Consolidated Street Ry. Co. v. Owings, 97 Ga. 663; Turton v. Electric Co., 185 Pa. St. 406; Larson v. Railroad, 56 Ill. App. 263; Haynes v. Gas Co., 114 N. C. 203; Electric Ry. Co. v. Shelton, 89 Tenn. 423; 1 Thompson on Negligence (2 Ed.), sec. 802; Overall v. E. L. Co., 47 S. W. 442; Ennis v. Gray, 87 Hun. 355. (5) A defendant who has failed to exercise ordinary care, according to the degree of danger, and whose negligence or lack of care has resulted in injury, will not be excused by the fact that he could not have reasonably anticipated the injury at that particular time. Hoepper v. Hotel Co., 142 Mo. 378; Miller v. Railroad, 90 Mo. 389; Graney v. Railroad, 140 Mo. 89; City of Dixon v. Scott, 181 Ill. 116, 21 Am. and Eng. Ency. of Law (2 Ed.), 488. (6) A defendant whose negligence has directly contributed to plaintiff's injury will not be excused by the fact that other causes for which he was not responsible have also contributed proximately to the injury in such a manner that but for them the injury would not have happened. Lane v. Mfg. Co., 160 Mo. 608; Bassett v. St. Joseph, 53 Mo. 290; Musick v. Dold Pkg. Co., 58 Mo. App. 322; Brennan v. St. Louis, 92 Mo. 482; Hull v. Kansas City, 54 Mo. 598; Waller v. Railroad, 59 Mo. App. 410; Meade v. Railroad, 68 Mo. App. 92; McDermott v. Railroad, 87 Mo. 285; Ring v. Cohoes, 77 N. Y. 83. (7) The question of contributory negligence of the plaintiff's deceased husband was a question of fact properly submitted to the jury. Snyder v. Telephone Co., 112 N. W. 776; Gloucester Electric Co. v. Dauer, 153 Fed. 139; Memphis Co. v. Bell, 152 Fed. 677; Hausler v. Electric

Co., 88 N. E. 561; Leque v. G. & E. Co., 113 N. W. 946; Dutcher v. Electric Co., 108 N. Y. S. 567, 88 N. E. 1118.

NIXON, P. J.—Alexander J. Trout was killed while at work as a lineman in the city of St. Louis on July 26, 1907, on one of appellant's poles carrying the appellant's electric wires and on which poles were strung also the wires of the Bell Telephone Company. This is an action by the widow to recover of the appellant for his death. Respondent obtained judgment for seven thousand dollars from which the defendant has appealed.

The petition charged that the plaintiff's husband was employed as a lineman by the Bell Telephone Company, which company operated a telephone system in the city of St. Louis; that on July 26, 1907, and long prior to that date, the defendant, Laclede Gas Light Company, and the said Bell Telephone Company maintained their respective systems of wires on the same line of poles, the wires of the telephone company being strung upon cross-arms attached to said poles and immediately above the wires of defendant, which were likewise attached to the cross-arms of said poles; that defendant's wires were in such close proximity to the wires of the telephone company, that the linemen of the latter company, while in the discharge of their duties working upon the telephone wires, were liable to come in contact with the defendant's wires; that defendant's wires were heavily charged with electricity of high voltage and dangerous to human life unless they were safely and wholly insulated, which facts were known to the defendant or might have been known by the exercise of ordinary care. The petition further charges that on the date mentioned above, and long prior thereto, "defendant carelessly and negligently failed and omitted to protect one of its wires at said point, near a pole on said line, with safe or sufficient insulating material, and carelessly and negligently

permitted the covering used thereon to become worn, rotten, defective and wholly insufficient to render it safe to persons required to be thereabout or coming in contact therewith," and that by reason thereof the deceased husband of plaintiff, while working upon the wires of the telephone company on said pole in the line of his duties, received an electric shock "from said wire then and there thus defectively, insufficiently and unsafely covered and insulated," thereby immediately causing his death.

The answer was a general denial and a plea of contributory negligence.

Plaintiff's husband was an employee of the Bell Telephone Company and was an experienced lineman of many years' service. The defendant, Laclede Gas Light Company, had its poles in various parts of the city upon which wires were strung carrying electricity for lighting purposes. Besides its own wires, the poles of the defendant also carried the wires of two other companies, The Bell Telephone Company and the Union Electric Light and Power Company. The telephone company had leased from the defendant the cross-arms on which its wires were strung, paying the defendant an annual rental for their use. For purposes of its own, the telephone company desired a new and higher pole for its wires on the corner of Grand and Kossuth avenues. It accordingly obtained permission from the defendant to erect a new pole at that place, the telephone company agreeing to erect the new pole and to transfer all the wires from the old to the new pole at its own expense, the new pole, however, to belong to the defendant. After the telephone company had erected the new pole, it sent its employees, of whom plaintiff's husband was one, without notice to the defendant, to take the wires down from the old pole and string them on the arms of the new pole, and it was while working on the old pole loosening the wires preparatory to their transfer to the new pole that plain-

tiff's husband received the shock which caused his death. The wires of the telephone company had a 500 volt circuit. The defendant's wires carried 2300 volts and those of the Union Electric Light and Power Company carried 4500, the wires of both of these latter companies being high tension wires. The telephone company had some ten or twenty wires on this pole, the Union Company two wires and the defendant four wires. The evidence shows that sixty per cent of the Bell Telephone Company's wires in the city of St. Louis are hung upon poles with wires of high tension, and that in the ordinary and usual discharge of the duties of a lineman working for the Bell Telephone Company, approximately sixty per cent of the time he works is spent on poles on which there are wires of high tension. The evidence further shows that a voltage of 2300 is dangerous to life and that wires carrying such a voltage are always treated as live wires.

The testimony of the defendant's witness, Wm. Thompson, was that he was the assistant superintendent of construction of the Bell Telephone Company in St. Louis; that he had been engaged in telephone work for twenty-seven years and was a lineman of twelve years' practical experience himself; that the general custom is to treat all electric light wires as high tension wires and take due precaution to be safe when handling wires around them. "The custom is to treat them all as live wires; by that I mean that they treat all electric light as high tension wires or high voltage wires. By being 'alive' we mean that the dangerous current is there at all times; by being 'alive' we mean dangerous. A live wire is a dangerous wire. Linemen treat them by insulating themselves with rubber gloves and rubber boots. Our men do not wear these gloves all the time working on our wires. It is not a universal custom. It depends upon the conditions under which they are working."

John P. Regan, inspector of the lighting department of the city of St. Louis, testified for the plaintiff that it was his duty to make inspections of wires and poles, to attend to all kinds of complaints coming from citizens pertaining to wires, and also to visit places of accidents. He stated that high tension wires, even when new, are dangerous, and that contact with such a wire is to be avoided. That there is no insulation known to manufacturers or users of high tension wires which is a complete and absolutely perfect insulation and that this fact is well known to linemen.

The crew of men with which deceased was working at the time of his death, as stated, was employed by the Bell Telephone Company to transfer the wires from the old pole to the new pole. A wagon accompanied the men, containing, among other things, rubber gloves and rubber boots for the use of the men when in the course of their work they were liable to come in contact with or handle live high tension wires. The rules of the telephone company required that its employees wear these gloves and boots when engaged in work upon poles carrying high tension wires, and when the occasion required their use. Such an order had been given to deceased when he was holding the position of foreman. The rubber gloves and boots which were furnished had been tested as to their non-conductivity and would withstand a voltage of sixty-six hundred.

Plaintiff's husband was killed at about four o'clock on the afternoon of July 26, 1907. Immediately after his death, one of the defendant's wires was found with a bare spot where the insulation had been abraded, and the wire was exposed. The deceased was working on the pole on which this wire was strung and had been working on it all day. He wore neither rubber gloves nor rubber boots, but did wear, according to some of the witnesses, leather gloves, and he was wearing them a short time before the accident. Just before his death, while working on this pole, his shoulders were on a line about even

with the second cross-arm.  He put his safety belt. around the pole, and with his spurs dug into the pole so as to offer support to his feet, leaned back, and was thus enabled to use his arms and carry on his work. At this time, he was on the pole for the purpose of loosening and preparing to transfer the wires, and prior to the shock which he received, he had been engaged in tracing bridle wires belonging to the telephone company.  No witness could tell exactly what he was doing at the moment the shock was received.  He was facing east reaching out towards the south with his right hand, and at the time, the telephone company's wires would strike him at about his chest.  About eighteen inches or two feet below was the wire of the defendant, being, therefore, somewhere opposite his hips.

The testimony showed that there was an abrasion on the defendant's wire about three feet from the pole, and that in order for deceased to come in contact with the place where the wire was abraded he would have had to reach out some two or three feet from the pole. The abrasion in the wire was at his right.  The evidence tended to show that the shock which occasioned the death of plaintiff's husband must have been caused by deceased coming in contact with two conducting points, and that being on the pole, his body must at some point have come in contact with some other wire in such a manner as to serve to conduct the electricity. The evidence of the physician, who saw the deceased almost immediately after his death, shows that he made an examination and found a burn on the end of the second finger of the right hand, and one at the base of the thumb on the same hand, and he stated that deceased was also burned on his left shoulder.  Witnesses to the accident testified that they saw his head and arms drop, that a flash became visible, that there was an odor of burning flesh, and that the deceased sank back upon his safety belt.  Shortly after the deceased was taken from the pole, the wires on which he had been working

were examined. On the third arm, on the southern end, and at Trout's right hand as he was facing east, some two and one-half feet from the pole; one of the defendant's wires was found which had an abrasion in the insulation exposing the bare wire for about the space of a quarter of an inch. The insulation at that point was burned black. It appeared also that the insulation on that wire had been abraded or worn in some way for some space and was thinner than insulation usually is; that there was a space of some fourteen or fifteen inches with several places where the insulation was nearly off, and on one place the insulation was entirely off for a quarter of an inch. There was no way by which it could be told how long the insulation had been worn off.

As the evidence shows beyond all question, the deceased was an experienced lineman of many years' service, and was thoroughly familiar with 'the handling of live wires and was qualified for the duties which he was performing. He had himself been a foreman over other linemen and knew all the hazards and perils of the business. The evidence shows that he knew from years of experience that high tension wires, even when new, were dangerous, and that contact with them was to be avoided; that no insulation known to manufacturers or users of high tension wires was complete and absolutely perfect insulation. He knew also from long experience that with a wire carrying 2300 or more volts and with the best of insulation, the electricity was likely to jump through at any time even when the insulation was new; also, that the weather and natural agencies had the effect to rot and cause the insulation to deteriorate, that smoke and acid in the air would bring about the same result, and that the wires were likely to become exposed from both age and friction. During the many years he was at work, approximately sixty per cent of the time he was working on poles he was in the immediate vicinity of live wires. The declaration

of deceased just before the accident to a fellow em-
ployee who was going up a pole among the same wires,
"Be careful, I don't know what they are carrying; they
are liable to get you," shows that deceased understood
the situation. Their instruction was that in order to
insulate themselves from these high tension wires, the
linemen were on proper occasions to wear rubber gloves
and rubber boots. He knew that rubber gloves were
insulating gloves. The wagons that went with the crew
that day were equipped with rubber gloves and rub-
ber boots and the gloves had been tested at 6600, so
that the linemen would be insulated from a current car-
rying less than 6600 volts. The deceased on the day of
the accident did not wear rubber gloves. Some of the
witnesses testified that he had on leather gloves.

The defendant, at the close of all the testimony,
offered a demurrer to the evidence for the reason that
the plaintiff's husband was as a matter of law guilty
of contributory negligence, in that, having been pro-
vided with rubber gloves and rubber boots for the ex-
press purpose of protecting himself against dangerous
wires, he failed to wear either the gloves or the boots.

The charge of negligence against the defendant is
that the wires of the Bell Telephone Company, of which
deceased was an employee, were in close proximity to
the wires of the defendant company, and that the line-
men of the Bell Telephone Company, in the discharge
of their duties and while working upon the telephone
poles, were liable to come in contact with the defend-
ant's wires which were charged with electricity of high
voltage and dangerous to human life unless they were
safely and securely insulated, and that the aforesaid
facts on said day and long prior thereto were known to
the defendant or by the exercise of ordinary care might
have been so known. It will thus be seen that the lack
of proper insulation of defendant's wires is made the
ground of liability in this case. The condition of the
insulation was shown to have been defective and to have

consisted of certain abrasions on the insulation of one of the wires of the defendant company. It was charged that the defendant had for a long time permitted the wires to remain in that condition. There was no evidence offered by plaintiff to show how long the insulation had been defective and worn off.

The appellant has assigned as error that there was no evidence showing how long the abrasions on its wires had existed and that by reason thereof appellant's demurrer to the evidence should have been sustained. The evidence in the record shows that the pole upon which deceased met his death carried the electric wires of three companies. The appellant was the owner of the pole, but had given its consent to the Bell Telephone Company prior to the death of the deceased, to erect for it a new pole, and that its wires might be removed and strung upon a new pole. The Bell Telephone Company and the appellant were joint users of the pole, and the telephone company, the master of the deceased, desired a new pole which the appellant had consented might be erected in the vicinity of the old one, and to which the wires of both companies were to be removed. The Bell Telephone Company had agreed to erect the new pole at its own expense, and to remove to it the wires of the appellant. The deceased was one of the servants and linemen of the Bell Telephone Company, and was, on the day he met his death, engaged in the work of detaching its wires for the purpose of removing them to the new pole. The evidence is uncontradicted as to the existence of the abrasions on appellant's high tension wire which caused the injury, and that it carried a voltage of some 2300. Of course, the appellant knew that its wires, unless properly insulated, were dangerous to human life. The appellant, while admitting the defective insulation of its wires, as stated, challenges the sufficiency of the evidence to show how long such abrasion had existed, or that the appellant company had any knowledge of such defect, and for these reasons it is insisted there

was a failure of the evidence to show negligence on the part of the appellant company.

The rule stated in the case of Geismann v. Missouri-Edison El. Co., 173 Mo. l. c. 678, 73 S. W. 654, by Judge BURGESS, is in the following language: "It follows from these authorities that it was defendant's duty, in the first place to use every protection which was reasonably accessible to insulate its wires at the point of contact or injury in this case, and to use the utmost care to keep them so, and the fact of the death of Geismann is conclusive proof of the defect of the insulation and *negligence of the defendant,* and as to whether he was guilty of contributory negligence or not was a question for the jury."

As was also said in the case of Von Trebra v. Gas Light Co.: "It is elementary law in this state that a demurrer admits every fact to be true which the evidence in the case tends to prove, whether by direct testimony or by reasonable deductions to be drawn therefrom. According to this rule, the court properly refused that instruction (demurrer to the evidence), for the reason that there was evidence in the case which tended to prove that Von Trebra came in contact with the wires of defendant, and that when he did so a flash of light was seen at the point of contact, and that he was, at the same instant, seen to fall head-foremost from the pole to the ground, in an unconscious condition, thereby receiving injuries, and that he died therefrom shortly thereafter. *This evidence made out a prima facie case on the part of the plaintiff, which entitled her to have the issues* of fact submitted to the jury." [209 Mo. l. c. 658-659, 108 S. W. 559.] The facts in the Von Trebra case, as just recited from the opinion of the court, are closely analogous to the facts disclosed in the record of this case, and the same conclusions of law necessarily arise from the evidence, and here, as there, make out a prima facie case on the part of the plaintiff which entitled her to have the issues submitted to the jury.

Further than that, in the case at bar, a section of the wire, containing the defective insulation, was offered by consent of parties as evidence in the case, and the jury were thus allowed to draw their own conclusions as to whether the abrasion of the insulation had been recently made or not, and also as to its defective condition.

Appellant further contends that deceased was guilty of such contributory negligence as to preclude a recovery in this case. The two corporations, each having its own wires upon this pole had a common interest in the use and maintenance of such pole to which the wires of each were attached. When two or more companies, by agreement, engage in enterprises calling for the use of wires to carry electricity, and arrange for the joint use of a pole to sustain such wires, each company is, with respect to such use, charged with the same duty towards the employees of the other company as towards its own employees. The correlative duty of the employees of the several companies is that they shall exercise due care for their own safety. [Cincinnati Gas and Electric Co. v. Archdeacon, 88 N. E. 125.] The law in such cases, as stated by many authorities, is that, where two companies by agreement or otherwise, use the same pole upon which to suspend their electric wires, they are joint owners and each owes a duty to the other company using said pole to use the highest degree of care in insulating the wires that are charged with a current of electricity of high voltage, and to keep them properly insulated; and, if either of them fail so to do, it is negligence, and the one failing is liable for the injuries sustained to the employee of the other company, provided the said employee using the pole was not a trespasser or a licensee but an invitee of the employer and a joint user. [Illingsworth v. Boston Electric Light Co., 161 Mass. 583, 27 L. R. A. 552; Day v. Light, Power & Ice Co., 136 Mo. App. 274, 117 S. W. 81; Stevens v. United Gas & Elec-

tric Light Co., 73 N. H. 159, 70 L. R. A. 119; Perham
v. Portland General Electric Co., 33 Ore. 451, 40 L. R.
A. 799; Newark Electric Light & Power Co. v. Garden,
78 Fed. 74, 37 L. R. A. 725; Joyce on Electric Law, vol.
2, par. 666A.] By no court, however, has the duty of
the defendant in such a case been more clearly, logical-
ly and comprehensively stated than by our own Su-
preme Court in its able opinions in the cases of Geis-
mann v. Missouri-Edison Electric Co., and Von Trebra
v. Gas Light Co., and their luminous statement leaves
nothing more to be added to the law of this state on
the questions therein discussed.

A more detailed explanation of the conditions and
surroundings of the accident in question becomes neces-
sary in order to get an intelligent view of the defense
of contributory negligence and duly appraise its real
value and determine the propriety of the ruling of the
court on the demurrer to the evidence. The examina-
tion of the deceased made immediately after his death
showed that there were two burns on his right hand,
one near the end of the second finger, and the other at
the base of the thumb, showing that the accident was
occasioned by the contact of his thumb and second fin-
ger with a live wire of high tension. There was also a
burn on the left shoulder. It necessarily follows that
in order for Trout to have received the deadly injuries
it was necessary for him to have brought himself in
contact with a high tension wire and some ground wire.
With an electric burn on his shoulder, and one on his
finger, he must have come in contact with two wires,
which made his body a short circuit for the electricity.
These burns indicated that he had come in contact with
two separate wires, one contact being made with his
hand and the other at the shoulder. The evidence is
very conclusive that he received the injury on his hand
by contact with the wire of the appellant at the place
where the insulation had been abraded. This is made
clear by the fact that a flash of light was seen to come

from the wire at the time of the contact of his hand with it, which made him immediately fall back upon his safety belt. At the same time, there was an odor of tar, caused by the burning of the tarred insulation, and soon afterwards, when the wire was examined at the place his hand came in contact with it, the insulation showed a fresh burn.

At the time of his death, deceased was handling a bridle wire of the telephone company. The customary way of handling this wire, as shown by the evidence, was for the lineman to trace it with his hand from the end of the heavy primary wire, around the insulator, down into the arm, and on down to the next arm, where it would join onto the heavy wire again. He would simply catch the eighteen wire from the point where it joined onto the main wire, and trace it down with his hand to where it joined onto the heavy wire again. This was the last work he was known to be engaged in, a few minutes at most, before the final shock.

The wires of the several companies on the pole on which the deceased was at work ran east and west on Kossuth avenue. The long way of the cross-arms on which the wires were strung was north and south, and they were parallel to each other. The wires of the Bell Telephone Company on which the deceased was at work, were some eighteen inches or two feet above the high voltage wires of the defendant company, and the defective insulation was some two or three feet south of the pole and immediately below, and some three feet from the place where the deceased was at work on the Bell telephone wires. The insulation on the high voltage wire of the defendant was abraded and broken in two places, in one place being naked about one-fourth of an inch. The insulation was of the three-braid variety, and one braid was off, or partly off, for about one inch. Besides this, there was another place on the wire, some three inches from the other spot where the insulation was nearly all gone. The high

voltage wire was nearly opposite the hip of. the deceased, the wire of the telephone company being about the height of his head.

Counsel for appellant in the case have failed to furnish us with any explanation of how this accident occurred except their theory that deceased was at work removing appellant's high tension wire at the time he made the contact, which claim is not supported by the evidence, and no showing is made how, from the position that the deceased occupied while at his work on this occasion, he could have received his shock from contact with the defendant's wire at the place where the insulation was defective, such defects being some three feet away. The evidence shows that the witness who saw the flash from the wire, also saw deceased fall back upon his safety belt, but the evidence fails to show directly whether deceased received the electric shock after or prior to his fall; that is, it fails to show whether he was brought in contact with the live wire by falling, or whether the contact with the live wire caused his fall.

One of the eye-witnesses testified: "I saw the worn place on the wire, the defendant's wire, about ten minutes after the accident. There was smoke; that is the way I know he got burnt on this wire. I saw the flash from the wire as he fell back; I heard the fall and looked up; I heard a noise from the wire and saw the flash from the wire and Mr. Trout fell back on his belt. The wire to which I refer was about opposite his hip, some eighteen inches west from the cross-arm—that is the wire he got burnt on, the one that is exhibited here "

The other eye-witness testified that at the time of the injury Trout was facing east and was on the west side of the pole; he had his safety belt around the pole; they used their spurs in the pole and put their safety belt around the pole and attached their belt and

swung back so that they could extend their arms out and work. He was working right in front of the pole, and right in the center. The wires of the Bell Telephone Company ran right from the pole east and west; he was facing east, his back to the west; they ran over his head, and the way his hands were working he was working right on them. "I saw Mr. Trout when he received the shock; not at the moment I didn't, but heard a kind of a sudden groan; I looked up and saw his hand and head and feet fall down at the time and he hung on the safety."

The physical facts thus tend to show that if the deceased had lost his balance when his body was extended, as he was reaching out and tracing the Bell wires, thereby causing him to fall, he would have been likely to have fallen in such a way as to have brought his hand in contact with the naked wire of the defendant below him. The conclusion that the deceased, by an accidental fall, was brought into contact with a live wire causing his death is consistent with all the facts and circumstances concerning the injury, and it meets the standard requirements concerning proof by circumstantial evidence. The burden of proof of every constituent fact of contributory negligence was upon the appellant, and this court is precluded from disturbing the verdict of a jury after it has passed upon the facts, *provided there are any substantial facts,* as we must respect the constitutional rights of litigants to a trial by jury, if they had a basis of fact. The jury had a right to consider all the physical facts in this case and to draw its conclusions therefrom.

The able and resourceful attorney for the appellant, in order to avoid the conclusions suggested arising from the examination of the physical facts, now takes the position that if the deceased lost his balance and accidentally slipped or fell, the appellant was not responsible for such fall, because under this view of the facts, the slipping and falling of the deceased was

the proximate cause of the injury, and not the exposed wires. We cannot state the unanswerable reply to this position in more apt or cogent language than that of Judge Smith, in speaking for the court in the case of Musick v. Dold Packing Co., 58 Mo. App. l. c. 333, which was an action by plaintiff for damages due to slipping into defendant's uncovered tank. In that case, as in this, the defendant contended that it was not liable because the slipping was the proximate cause of the injury. The reply of the court was as follows: "It is true that if the plaintiff had not slipped his limb would not have been plunged into the hot water tank. It is equally true, that though he slipped, the disaster would not have overtaken him had not the tank been uncovered. The slipping was not the sole cause of the injury. The latter would not have occurred except for the presence and co-existence of both causes. The cause of the plaintiff's slipping was altogether accidental. If it was the sole cause of the injury the defendant is not liable. But the injury would not have resulted had not another cause combined with the accidental cause. If the plaintiff was in the exercise of ordinary care and prudence at the time he slipped and the injury is attributable to the absence of the cover over the tank together with the slipping, then the plaintiff should recover. If the direct and proximate cause of the injury was the uncovered and unprotected condition of the tank, then plaintiff would be entitled to recover though the slipping of the plaintiff contributed to the injury."

It has also been held that if one, by some involuntary mischance, precipitates a casualty resulting in injury to himself, but was exposed to danger of the casualty by another's negligence, the law does not always construe his own mischance, instead of the prior negligence of the other party, to be the proximate cause of the injury, and shut him off from danger. Whether the injured party will be denied relief depends on whether he himself was guilty of negligence that proxi-

mately caused the harmful accident. [Kube v. St. Louis T. Co., 103 Mo. App. 582, 78 S. W. 55.] Of course, in the case under consideration, if the slipping and falling was the result of the negligence of the deceased, then there could be no recovery; but the proof of such negligence, being an affirmative defense, rests upon the defendant, as the law will not presume the negligence of the deceased in the absence of evidence to that effect.

One of the chief contentions of the appellant is that the deceased was guilty of contributory negligence by reason of having failed to wear the rubber gloves furnished him by his master for handling wires of dangerous voltage. The facts tended to show that such gloves were furnished by the Bell Telephone Company to its linemen, that they are a complete protection in handling live wires, and that the deceased had such gloves in his outfit with him on the day of the accident, but that he failed to use them. The duty of the deceased to wear these gloves under the instructions of his master is shown in the evidence of the assistant superintendent of construction of the Bell Telephone Company. He testified that the instructions to the linemen as to wearing gloves were that they were to be used by the men when the occasion required; also, that the linemen did not wear the gloves all the time they were working on the telephone wires; that the use of the gloves was not a universal custom but depended upon the conditions under which they were working. It is quite evident that the gloves were principally provided for the purpose of protecting the workmen from injury in case of contact with high tension wires, and they were only used whenever the danger of such contact existed. The evidence further shows that the linemen very seldom wore gloves, and only in cases of necessity; if they were in a dangerous place working on the telephone wires they might use rubber gloves; that it was hard for them to use them when handling

small wires on account of the gloves being heavy; and, as testified by the inspector of the lighting department of the city of St. Louis, "they seldom used them, only in cutting off trouble; what we call trouble is when one of their wires is down on an electric light wire."

In order to arrive then at the validity of the appellant's contention that the deceased was guilty of contributory negligence in not wearing the rubber gloves at the time of his death, we should recall the fact that the deceased at the time he was injured, was at a place where his business required him to be, and where he had a right to be, and was in the line of his duty and was where the defendant had a right to anticipate he would be. It was accordingly the duty of the defendant as to him on that occasion to know that its wires were charged with electricity of high voltage, and deadly to human life, unless safely and securely insulated, and that in the discharge of their duty, linemen of the Bell Telephone Company would be likely to come in close proximity to these wires. It was beyond question its duty to insulate them at that point, and to use the utmost care to keep them so, and thereby avoid personal injury that was likely to ensue from such failure.

Several witnesses who were upon the pole after the injury, and who examined the wire, testified as to the defective insulation, and stated that the abraded insulation was obvious and visible, and that any person who was on the pole and would have made an inspection could have seen these defects. The evidence tended also to show that the deceased had been at work on the pole during that day, and fairly tended to show that it was probable he had gone up and down the pole several times prior to his injury. It is apparent, under the evidence, that while ascending or descending the pole, if he had made an examination for that purpose, he could have seen the abrasions on the wire, as they were only some two or three feet south of it. As to

whether the deceased actually did see the exposed wire there is no evidence. In this connection, it must be considered that the deceased had a right to assume that the defendant had performed its duty in protecting its wires. He was only required, in any event, to look for patent defects in any wire with which he was likely to come in contact, and in order to constitute contributory negligence, it must have been shown that he voluntarily and unnecessarily exposed himself to danger. Clements et al. v. Louisiana Electric Light Co., 16 L. R. A. 43.] But the conclusion by no means necessarily follows that he saw the defective insulation because the evidence shows that the witnesses after the accident readily saw it when they went up on the pole to make the examination. It must be considered in this connection that such witnesses at the time knew that Trout was dead and had received his injury while on the pole; they knew that he was electrocuted, and had their attention specially called to the defective insulation, and went upon the pole to examine for the defect. Deceased, it must be recalled, was not the trouble hunter or inspector of any of the companies whose wires were strung on the pole; it was not especially his duty to examine the wires to ascertain whether they were properly insulated in order to correct any such defects, if any existed. But, from the point of view that deceased actually knew of the defective insulation, it does not necessarily follow that the trial court could declare as a matter of law, that he was guilty of contributory negligence. If he knew of this abrasion, the evidence still shows that it was some two or three feet from the pole on which he was working, and he could and did safely pass up and down the pole, in the discharge of his duties, without any peril by reason thereof. He was not at work at the time on the defective wire, and there was no reasonable probability of his coming in contact with it. Whether under these circumstances, his action constituted negligence or not was the ques-

tion to have been submitted for the jury to determine. It was their special province to settle the question whether a reasonably prudent man would have acted in the same way under the circumstances. If, in fact, he knew of the defective wire, and there was no reasonable ground for him to believe that he would come in contact with it, and hence be exposed to injury, then he could not, as a matter of law, be charged with negligence.

The evidence as to the conditions under which rubber gloves were used among linemen of telephone companies was not objected to. "The only test by which it can be determined whether ordinary care has been used or omitted in any particular case is the test of negligence in general, which may be formulated thus: There has been a want of ordinary care, when, under all the circumstances and surroundings of the case, the person injured, or those whose negligence is imputable to him, did or omitted something which an ordinarily careful and prudent person would not have done or omitted." [7 Am. and Eng. Ency. of Law, 378.] "It is well settled that usage or custom cannot excuse negligence; or, in other words, though the defendant's act or omission was customary, or was performed in a usual or customary manner, it may yet be deemed negligent if not up to the standard of reasonable care. Not a few cases, indeed, hold that evidence of usage or custom is inadmissible on the question of negligence. But where, as in many cases, the question distinctly presented to the jury on the issue of negligence is what consequences the defendant should have contemplated as a result of his act or omission, evidence of usages or customs in the particular business in which the defendant is engaged is frequently received. If, on the one hand, the defendant's act or omission was pursuant to a known custom or usage long observed by persons engaged in the particular business without injurious results, it is proper to consider this circumstance in

determining what the defendant should have foreseen. On the other hand, if the alleged negligence of the defendant consists in an omission to observe or adopt a particular precaution prescribed by custom or usage, the fact of the existence of such a custom or usage may for the same purpose properly be considered by the jury."[21 Am. and Eng. Ency. Law, 524.] Referring to these passages, the court in the case.of the Consolidated Gas, Electric Light & Power Co. v. State, 72 Atl. 1. c. 658, said: "The principle thus enunciated commends itself as rational and sound."

Under these authorities we are persuaded that the appellate court would not be authorized to declare, as a matter of law, that it was conclusively negligent for the deceased, under the conditions shown in the evidence, to work where he was working without wearing the rubber gloves. This case is to be sharply distinguished from that of Junior v. Electric Light & Power Co., 127 Mo. 79, 29 S. W. 988, upon which the appellant has placed great stress and which it claims is controlling in this case. The evidence distinguishing the Junior case from the present case is very apparent upon the slightest consideration. In that case the deceased lineman was upon the pole for the purpose of making connection between two ends of live wires, which he knew carried a high voltage. The facts showed that at the time it was "broad daylight; that the two live wires were devoid of insulating material at their extreme ends of the space of one-eighth or one-sixteenth of an inch; and that the deceased sat upon a cross-arm of the pole preparing to connect a wire for the butcher shop with these ends; that the fact that these two ends of the wires were not insulated was an open and obvious, and could not only be seen by deceased who was in close proximity thereto, but both Baldwin and Baurman testified that they saw the two exposed ends from their position on the ground, thirty feet distant; Baldwin was a brother-

in-law of deceased. It appeared that deceased was an experienced lineman; understood his business, and that the linemen were the only employees of defendant who went on the poles and handled, connected and repaired the wires thereon and the only employees who had an opportunity to inspect and know the condition of the wires; the testimony of the brother-in-law, the foreman of the squad, was that he did not caution the deceased that the ends of the wire were exposed that day, because it was not only open and obvious, but it was the peculiar business of deceased to see and know that, and the connection was to be made with these wires." It further appears that "there were six arms on the pole upon which he had climbed on which were strung the wires of the telephone and telegraph companies and of the fire alarm service, all charged with electricity and all uninsulated." [Junior v. Electric Light & Power Co., supra.]

It is therefore seen in the Junior case it was the peculiar business of the deceased to know the condition of the wires, and that deceased not only knew that these wires were devoid of insulating material, but also that he was engaged in handling these exposed ends for the purpose of making the connections between the exposed ends at the time he received his injuries. The same explanation applies to the cases of Hart v. Allegheny County Light Co. et al., 50 Atl. 1010, and Judge v. Narragansett El. Lt. Co., 42 Atl. 507, and White v. Thomasville Lt. P. Co., 66 S. E. 210. These cases and the Junior case, under the facts developed in their respective records, place them in an entirely different class from the case now under consideration. We think this case clearly falls within the principles announced in Snyder v. Mutual Telephone Co., 112 N. W. l. c. 779 and Knowlton v. Des Moines Edison Light Co., 90 N. W. 818; and not under the principles of Junior v. Missouri Edison El. Lt. Co.

From these considerations, arising from an exhaustive re-examination of the evidence in this case, we reach the conclusion that the defense of contributory negligence was an issue that could only be determined by the jury, and that the demurrer to the evidence was properly overruled. Finding no reversible error in the record, it is ordered that the judgment of the trial court be affirmed. All concur.