J. FRANK LOFTY, Admr. of the Estate of LESLIE PHILLIPPI, Respondent, v. LYNCH-McDONALD CONSTRUCTION COMPANY and the CITY OF MOBERLY, Appellants.*

In the Kansas City Court of Appeals, November 5, 1923.

1. **ELECTRICITY**: Negligence: Maintaining Uninsulated Wire Charged with Electricity in Close Proximity to Place Where Workman was Rightfully Engaged Held Negligence. It was negligence to carry and maintain uninsulated wires charged with electricity over the roof of a shed and within three or four feet distant therefrom while one rightfully thereon was engaged in removing metal pipes which were stored upon said roof.

2. ———: ———: Evidence Held to Justify Finding, without Piling Inference upon Inference, That Deceased was Killed by Electric Shock. Evidence *held* to justify jury in finding, without piling inference upon inference, that deceased was killed by electric shock from coming in contact with uninsulated wires charged with electricity, while rightfully engaged in removing a metal pipe from the roof of a shed, a short distance above which was located the uninsulated wires.

3. ———: ———: Contributory Negligence: Under Evidence Deceased Held not Conclusively Guilty of Contributory Negligence. Where one was killed by electric shock while rightfully removing

(163)

a metal pipe from the roof of a shed, three or four feet below, by highly charged, uninsulated wires, *held* not conclusively guilty of contributory negligence in not seeing the wire or in the manner in which he pulled the pipe from the roof.

4. MASTER AND SERVANT: Scope of Employment: City Employee Held not to be, as a Matter of Law, Outside the Line of His Duty. An employee of a city engaged to operate an electric pump and keep clean and dry the pumping station of a new waterworks, which was under construction by a contractor, who to remedy a situation concerning his own safety and which the contrator had failed to remedy, undertook to get a metal pipe off the roof of a shed to repair a defective drain from which water was dripping rendering the floor wet, and was killed by it coming in contact with an uninsulated electric wire, cannot be *held*, as a matter of law, to have been outside the line of his duty, although an engineer for the city had told him not to do anything about the drain as it was part of the work the contractor was required to do under his contract.

5. ———: Negligence: Even if Injured Employee was Injured Outside Line of His Duty Held no Defense to Negligence of Third Person. Where a city employee was engaged to operate an electric pump at a pumping station of a new city waterworks, which a contractor was constructing, even if he was outside the line of his duty while attempting to remove a metal pipe from the roof of a shed with which pipe he intended to repair a defective drain to prevent water from dripping on the floor, for his own safety, it being his duty to keep the same dry, and while removing the pipe it came in contact with an uninsulated electric wire, killing him, *held* that the contractor could not claim immunity from liability on this ground.

6. ———: ———: Either or Both Parties to an Enterprise, under Proper Circumstances, May be Liable for Injury to an Employee of One of Them. Where defendants were engaged in an enterprise calling for use of wires to carry electricity, either or both might, under proper circumstances and conditions, be liable for an injury occurring to an employee of one of them, by electric shock.

7. ———: Independent Contractor: Employer's Supervision of Work Does Not Affect Contractor's Status as an Independent Contractor. That the city had an engineer merely to see that the work of contractor, constructing a waterworks plant for it, was done according to the contract, does not affect the contrator's *status* as an independent contractor.

8. ———: ———: Negligence: City Held not Guilty of Negligence in Failing to Furnish an Employee Who was Killed with Reasonably Safe Place to Work While Working in Plant under Construction by Independent Contractor. Where a city did not sent its employee to a place that was necessarily and in the ordinary course of events dangerous and unsafe, but to one where the danger arose through the negligence of a contractor, not only in not having proper drains, but also in running its electric wires so close to material that was easily accessible and which was adapted to use in remedying the situation, caused by the failure to have the drains, and when the dangerous situation in the pumping station, actuating the deceased to secure the pipe which caused his death by coming in contact with the electric wires, did not arise until the pumps were put in operation, it is *held* that the city was not guilty of negligence in failing to furnish deceased with a reasonably safe place to work.

9. DEATH: Measure of Damages: Instructions: An Instruction Based upon Deceased's Probable Earnings for His Life Expectancy, Alone, Held Erroneous. In an action for damages for death where an instruction on the measure of damages was based upon deceased's probable earnings for his life expectancy, was erroneous, because the expectancies of his father and mother, the principal bene- ficiaries for whom the suit was brought, were vastly less than his own.

*Headnote 1. Electricity 20 C. J., Section 42; 2. Electricity 20 C. J., Section 66; Evidence, 23 C. J., Section 1797; 3. Electricity 20 C. J., Section 66; 4. Master & Servant, 26 Cyc, p. 1242; 5. Master & Servant, 26, Cyc, 1570 (1926 Anno); 6. Electricity, 20 C. J., Section 50; 7. Mas- ter & Servant, 26 Cyc, p. 1549; 8. Master & Servant 26 Cyc, p. 1447; 9. Death, 17 C. J., Section 183.

Appeal from the Circuit Court of Randolph County.— *Hon. A. W. Walker,* Judge.

REVERSED AND REMANDED as to Appellant, Construction Co. REVERSED as to appellant, City.

*Jerry M. Jeffries* for respondent.

*Willard P. Cave* for appellant, Construction Co.

*Austin Walden* and *Hunter & Chamier* for appel- lant, City.

TRIMBLE, P. J.—This is an action by the administrator of the estate of Leslie Phillippi to recover damages for his death, which is alleged to have been caused by electricity through the negligence of the defendants, the city of Moberly and the Lynch-McDonald Construction Company. For brevity, the defendants will be referred to respectively as the City and the Construction Company. The latter was under contract with the former to build, and was engaged in erecting, a waterworks plant to supplement the then existing water system of the city. The jury returned a verdict of $2000 against both defendants and each of them has appealed.

The petition alleged that on and prior to the 14th day of April, 1922, defendants were together engaged in building and equipping a water and filtration plant for the city, and had previously erected a small shed to be used, and which was then being used, by them in said work; that defendants had placed on said shed a quantity of small metal pipe for use in said work; that prior to said date defendants had erected at the side of the shed a brick building called the pump station and filtration plant in which they had installed, and were operating in connection with said work, electric engines, dynamos and pumps; that at some distance from the shed they had, in connection with said work, erected a pole; that from the top of said pole defendants had carelessly extended uninsulated copper wires down, over said shed and over the metal pipes thereon, to said brick building and into the same at the side thereof, and connected said wires therein so that they carried a dangerous current of electricity from the dynamos in said building to the pumps, engines and lights of defendants located elsewhere and used in connection with said work, and that defendants negligently permitted said wires to remain in said position uninsulated and dangerous while carrying said deadly electric current; that on April 14, 1922, said Leslie Phillippi, then employed by defendants in the work of building and equipping said waterworks, was by them

directed in and around said shed and brick building, and, in so working, with due care on his part, he took hold of said pipes when another part of same came in contact with said wire charged with a deadly electric current, and he received a shock from which he then and there died.

The answer of the Construction Company, after denying generally, set up three defenses: 1. That Phillippi was an experienced electrical worker, knew the dangers of said business, and, if his death was from electric shock, it was caused by his own negligence in failing to observe the bare wires in plain view, and in carelessly handling iron pipe in close proximity thereto and allowing said pipe to come in contact therewith. 2. That the Construction Company built the pumping station and plant, including the electric transmission line, in accordance with plans and specifications adopted by the city. 3. That Phillippi, at the time of his death, was in the employ of the city, and, in removing the pipe from the roof of the shed, was engaged in work entirely outside the scope of his employment.

The answer of the city was a general denial together with a plea of the following defenses: 1. Contributory negligence on the part of Phillippi, in that he, knowing the dangerous character of electric wires and that these carried a deadly current and having been warned against coming in contact with them, negligently attempted to remove a piece of iron pipe from the top of the shed with his back to said shed and carelessly allowed said pipe to come in contact with said wires. 2. That the wires were erected by the Construction Company, an independent contractor over which the city had no control, and said Company was in charge of the work at the time, not having completed it and the city, not having accepted it, was not the owner nor in charge of same.

These defenses were denied by appropriate replies on the part of plaintiff.

It seems that in September, 1920, the city employed the engineering firm of Fuller & Baird of St. Louis to prepare plans and specifications for, and to do the engineering work in connection with, the development of a new water supply and the erection of a new waterworks plant to supplement or take the place of the then existing system. Said engineers were to supervise the work to see that the work was done according to the plans and specifications, and a competent engineer was to be kept on the work at all times for this purpose.

Plans and specifications were prepared which the city by ordinance adopted, and afterward the city duly entered into a contract with the Constitution Company to build and install said plant in accordance with said plans and specifications.

The city had, at its old reservoir, an electric light plant in addition to its steam power water plant there, and for a number of years Phillippi, plaintiff's decedent, had charge of the electric plant and was familiar with electrical equipment and the dangers from electric wires.

The contract between the city and the Construction Company provided that a large portion of the big water main leading from the old reservoir to the city should be taken up and used either at the new reservoir or elsewhere in the extended city system. Of course, if the flow line of the old reservoir were taken up before the new plant was completed, the city would be without water during the time elapsing between the taking up of the old flow line and the completion and starting of the new plant. The contract further provided that the city should "have the right to use the whole or any part of the installation (i. e., new plant) which may be in condition, previous to final acceptance, and such use is not to be construed as an acceptance in whole or in part, but rather as a preliminary test of the installation."

A new flow line was laid from the old reservoir to the new pumping station, and when the new electric power plant had been installed therein, with the trans-

mission lines therefrom, the Construction Company, in order to perform that part of its contract requiring it to take up the old flow line from the old reservoir, requested the city to shut down its power plant at the old reservoir and transfer the city's employees who operated it to the new pumping station. In this way water for use of the city could be pumped by means of the new power plant even though the new reservoir and water system were not yet complete. The contract, as heretofore stated, provided that the city could do this without thereby impliedly accepting the work, and, hence, on April 8, 1922, the city shut down its power plant at the old reservoir and transferred its employees, including plaintiff's decedent, to the new pumping station, and thereafter water was pumped for the use of the city by means of the new power plant, though the new waterworks system had not been completed nor had any part thereof been accepted by the city.

Plaintiff's decedent had worked at the new station about seven days before his death. His shift or working period was from eight o'clock a. m. to four p. m. His duties were to operate the electric pump in the station (which could be stopped and started by merely pressing a button), and keep things neat, clean and dry. He was the only employee working at the pumping station during his shift.

At the time he came there and up to his death, the transmission wires running from the station to the pumps at the lake, when the power was on, carried a current of 2300 volts of electricity, which is a deadly current sufficient to instantly kill a man coming in contact therewith. These wires passed from within the building to a bracket on the outside of the building, fastened on the south side thereof at a point from twelve to fourteen feet above the ground; and from this bracket the wires ran south to a pole thirty-five feet high located fifty feet away and from thence they went on a line of poles in the usual way to the old reservoir. In going from this bracket on the

outside of the pump station to the first pole the wires passed over the shed located about six feet from the pump station, the wires being at a distance of from three to four feet above the roof of the shed. On top of this shed were several pieces of half-inch metal pipe stored there by the Construction Company, some of the pipe being seventeen feet in length. The ends of these pipes extended from three to six inches over the east edge of the shed roof. The door leading from the pump stations was on the south side of said station building and just east of the east side of the shed. Consequently, the ends of the pipes protruding from the roof of the shed were directly in front of and a short distance from the door leading from the pump station.

On the 14th of April, 1922, the day of Phillippi's death, he was at the pump station attending to his duties as usual. No one else was there except that the city chief engineer of the waterworks, Mr. Richardson, was there in the forenoon and after lunch returned to the station about 1:30 o'clock and then left and went up town. When Richardson was there Phillippi was operating the plant. The pumps there were water sealed, having a ring around the shaft that ran in water, and by reason thereof water would continually drip from the outside edge, and this water ran down upon the floor near the pump, making a wet place on the floor. It was necessary to keep the floor dry, else in working about an electrical plant one might, by standing on a wet place, establish perfect contact with the ground and be in great danger of getting a shock of electricity. To drain the water away and thereby keep the floor dry the Construction Company had placed at one of the drains some pieces of tin but they were not carrying off the water satisfactorily and Phillippi and Fuller, the city's supervising engineer to see that the new plant was constructed according to the plans and specifications, had improvised a drain made of pieces of various sized pipe. This pipe was unsightly, and there is evidence that it did not carry off all the sur-

plus water, since there was more than one drain there. There is also evidence that Phillippi, in addition to the regular work of operating the pumps, was, on the day he died, "doing that pipe work on the pumps, draining the water" and that it "was necessary that that work be done." The proper sized pipe for use in making such drains was half-inch pipe and that was the size of the pipe on the shed roof. When Richardson returned to the pump station at 1:30 he noticed the improvised drain of various sized pipe and told Phillippi not to do that work as it was the work of the Construction Company to put in the drains and to make repairs. To this Phillippi made no reply. Whether he heard what was said to him is not shown.

After leaving the plant at 1:30 and going up town, Richardson returned about 3:30. He found Phillippi dead upon the ground just east of the shed, his body lying with the head to the north, the head doubled under his body. A piece of half-inch pipe seventeen feet in length, one end of which was sticking three or four inches in the ground was leaning over his body and against the top of the shed, extending possibly some six or seven feet above the top thereof. Underneath the body was a board and near the side of the shed was a nail keg. One witness said there was nothing on the keg at this time but that usually there was a board across it. The electricity was on, the pumps were running and the gauge showed that at that time the water tower was full. The pipes on the shed with their ends sticking out over the east edge were about eight or nine feet above the ground. They were beyond the reach of a man standing on the ground, and to reach them one would have to get upon the keg. About 2:30 that afternoon, or an hour before Phillippi was found, May, a man who lived south of and "across the track" from the power house, saw from his back door a man pulling something from the roof of the shed. This witness said the man was standing apparently on the ground about two or three feet from

the shed with his back to the building, and had hold of what he was pulling with his right hand. He saw him pull on it once and then, witness's wife calling him, he turned back into the house and saw nothing more. An hour later he learned of the tragedy and went over and saw on the ground there a man, dead, who "looked to be the same fellow" he had seen pulling something off the shed. He was not personally acquainted with Phillippi and would not say positively he was the same man he saw.

A physician, who was called and got there shortly after deceased was found, testified that he found the body two or two and one-half feet from the shed with the head to the south, the face and all of the skin exposed was of a dark bluish condition. Nearby were some particles of food, looking like vomit, and close to this was a man's pipe and there were particles of food coming from the dead man's *nostrils*.

Each defendant separately demurred to the evidence, both at the close of plaintiff's side and at the close of all the evidence; but both were overruled.

Before proceeding to consider the separate points and complaints made by each defendant respectively, it may be well to first deal with the negligence charged as a basis of plaintiff's cause of action and if there is negligence upon the part of either or both of the defendants, then pass first upon those defenses raised by, and applicable alike to, both.

The shed was already existing on the ground at the time the contract for the erection of the waterworks was entered into. Who put it there or what it was for is not shown. The ground on which it stood and on which the pump station was erected was private ground belonging to the city. The Construction Company used it as a storage place for its tools and cement inside and placed iron pipe, cross arms, etc., on its roof. After the water plant was completed the Construction Company tore it down and removed it along with the other rubbish the

contract called for the contractor to remove. The plans and specifications did not describe how the transmission line should be brought into the building, but merely that it should be brought to the bracket mounted on the front thereof. The plans did prescribe that the wires should be bare, hard-drawn copper wire. There is some evidence that bare wire is used out on a line between poles, but that where a line enters a building it is heavily insulated and that such was the case at the old power house where decedent had formerly worked. However, as the plans and specifications provided that the transmission lines should be bare copper wire and brought by the contractor to the bracket mounted on the front of the building, the plans must be construed as providing that the wires in question should be bare. The plans did not specify how high the wires should be above the ground at the point where they entered the building, but clearly they impliedly required that the wires constituting the transmission line should be twenty-five feet above the ground since they were required to be fastened to cross arms at the top of thirty-foot poles set five feet in the ground. The evidence shows that at the old power plant the line entered the building from a pole only six feet away, so that the line came from a pole thus close directly down to the building; and plaintiff sought to show that when the new plant was accepted by the city, the line, instead of coming from the top of a pole fifty feet away, came from one set very close to the station; but defendants objected to this evidence and the court excluded it. But regardless of whether there was no negligence in the fact that the wires were uninsulated because the plans *legislatively* adopted by the city called for bare wires, nevertheless it was negligence to carry and maintain such wires over the shed and only three or four feet distant from the roof thereof and on which roof were stored the metal pipes aforesaid, thereby endangering the life of one who might attempt to remove any of the pipes. [Ryan v. St. Louis Transit Co., 190

Mo. 621, 633; Trout v. Laclede Gaslight Co., 151 Mo. App. 207, 221; Geismann v. Missouri, etc., Electric Co., 173 Mo. 654; Byerly v. Consolidated, etc., Power Co., 130 Mo. App. 593.] And the defendant guilty of such negligence would be liable for the death of one killed in the attempt to take said pipe down, provided he was in the exercise of due care and was rightfully so engaged.

Was there evidence from which the jury could reasonably find that deceased died from a shock of electricity? If there was not, then no other question in the case need be decided, since that disposes of the case. The theory of plaintiff is that the piece of iron pipe found over deceased's body and leaning against the shed was lying on the roof thereof and below the wires; that deceased, in order to procure a piece of pipe to make a drain from the pump so as to prevent the floor from getting damp thereby increasing the danger of electric shock, got upon the keg and after grasping the pipe was in the act of pulling it from the shed when the other end of the pipe came into contact with the heavily charged wire and he was instantly killed by the current passing through the pipe and his body to the ground.

We think there was evidence from which the jury could find that deceased was killed by electric shock from coming in contact with said wires. In addition to the facts shown as hereinbefore stated, the doctor testified that in his opinion decedent died from electrocution. This, he said, was indicated by the bluish color of the skin, and by the fact that *rigor mortis* was so slow in setting in, which is the case where one dies from an electric shock. Two witnesses also testified that on one of the wires, which were new, at a point above the roof was a place which looked like something had touched it and produced a little dent or upward bend in it. The ground about there was damp and wet affording a good connection for the electricity. Deceased's body was lying there "kinda crumpled up." The doctor testified that there was a mark on deceased's right hand which looked

like a bruise or a pinch, but not a burn. No marks were found on the pipe nor burns on deceased's body to indicate where the electric current entered and left the body. From this and from the circumstances relative to the particles of food resembling vomit and similar particles oozing from deceased's nostrils, defendants contend there is no evidence from which the jury could find he died from electric shock, but that the evidence tends rather to show that he suddenly became ill and died from that. But there was evidence tending to show that burns on the body do not always occur when one is killed by electricity; that burns occur when the contact is not perfect, but that when it is, burns do not appear. The particles of food oozing from decedent's nostrils, and similar particles looking like vomit lying near, do not conclusively show that deceased died from illness since such manifestations may have resulted from the convulsive shock of the electricity expelling the food from decedent's stomach. In the ordinance afterward passed by the city accepting the new water plant from the Construction Company, which ordinance was introduced by the defendant Construction Company, is a clause saying such acceptance should not prejudice the rights of the city in any controversy with the Construction Company arising out of said contract to build said waterworks as to certain matters, among which is mentioned the suit herein, giving its title and saying "which suit arose over an injury of a fatal nature received during the course of said work, and in the performance thereof, i. e., death by electric shock." As to the pipe not showing any mark on it, there is evidence that if the contact with the wire was made and broken immediately the pipe would not, or might not, show any mark. Under all the foregoing facts and circumstances the jury could reasonably find that deceased died from electric shock and, in so finding, the jury did not have to "pile inference upon inference."

Nor should it be said that deceased was conclusively guilty of contributory negligence in not seeing the wires

or in the manner in which he pulled the pipe from the roof. The wires ran south over the shed while deceased was at the east side thereof and it is not shown that deceased knew where the wires were or that from where he was he could, on account of the height of the shed, see the wires. Indeed, there is evidence tending to show that one could not see them until he was out further from the building. The wires running from the top of the thirty-foot pole fifty feet away down to the building might be in plain view to one looking up at them; and the bracket on the building to which they were attached might be in plain view to one looking up to that height and to that point; but under the circumstances, we cannot say decedent must conclusively have seen the wires over the shed had he been exercising ordinary care. There is evidence that in the afternoon when the sun was shining, it would be difficult to see the wires, and the day in question was a bright one. When the city employees were brought over to the new pump station, a man named Lindsay started to lay a pipe on the shed and Mr. McDonald, president of the Company, warned him to be careful and not touch the wires above it as they were "hot," but McDonald himself says that "Phillippi wasn't there." It is true he says that afterward when they began to operate the plant Phillippi was taken over the plant and "shown where all the wires were that would be liable to have a current on him" but this does not refer to the outside wires over the shed nor is there any evidence that he was told or warned of those wires. The evidence does not expressly disclose how or at what particular instant the pipe came in contact with the wire, but as the man was seen on the ground pulling something from the roof it is reasonable to infer that the contact occurred after he, having taken hold of the pipe while standing on the keg, had stepped to the ground, thus causing the other end of the pipe to be elevated until it touched the wire. The witness May does not say that the man had his back to the *shed* but that he had

his back to the *building;* but, even if he had his back to
the shed at the time of receiving the shock, this, under
the circumstances of the case, would not conclusively
render him guilty of contributory negligence.   Under
all the circumstances, that was a question for the jury.
[Hill v. Union Electric Light, etc., Co., 169 S. W. 345;
Geismann v. Missouri, etc., Electric Co., 173 Mo. 654;
Trout v. Laclede Gaslight Co., 151 Mo. App. 207; Hill
v. Union, etc., Power Co., 260 Mo. 43, 82-3.]

With regard to whether deceased was in the line of
his duty and employment in getting the pipe off the
shed, the Construction Company, although pleading this
as a defense, makes no point about it in its brief, while
the city, although not pleading it, strenuously urges
such point.   Without stopping to decide, however, wheth-
er this makes any difference in the right of either party
to rely on such point, and assuming that it is a neces-
sary part of plaintiff's case to show that deceased was
in the line of duty when killed, and that if plaintiff fails
to do that, advantage may be taken of it under the gen-
eral denial, still, under the evidence herein, we ought
not to say as a matter of law that he was outside the
scope of his duties.   It is true the evidence of Richard-
son, city engineer of the waterworks, plaintiff's witness,
is that he told deceased not to do anything further about
the pipe to lead the water away, giving as a reason there-
for that the placing of such drains was a part of the work
the Construction Company had to do under its contract;
and McDonald, defendants' witness, says he told de-
ceased not to do any work thereon, his reason therefor
being that as to that part at least of the contract under
which that work came, the Construction Company was
doing it on the "cost plus" basis, and if anyone else
put in the drains the Construction Company could not
get anything for it.   This may all be true, and yet, since
it was the Construction Company's duty to put in the
drains and it had not done so, and since it was dangerous
to have water on the floor, rendering it damp and afford-

ing greater liability of deceased's receiving a shock while working therein, and as it was his duty to keep things neat, clean and dry, we cannot say that deceased, as a matter of law, was outside the scope of his duties so as to forbid any recovery whatever, merely because he undertook to remedy a situation directly concerning his own safety and which the Construction Company had failed thus far to remedy. It is not a case where a servant voluntarily left his post of duty to do something wholly unauthorized and entirely outside the scope of his duty. Moreover, whatever right the city might have to object to any liability on its part in this regard, it would seem to be clear that, under the circumstances of this case, the Construction Company could not claim immunity on this ground.

Having reached the conclusion that the right to recover is not to be denied as a matter of law either on the ground of contributory negligence or because deceased was outside the line of his duty, the question next arises, who is liable, the city or the Construction Company, or are they both liable?

The petition charges that the defendants were together engaged in building a waterworks system and that deceased was employed by them in that work. The evidence does not bear this out. However, if there is a variance in this regard no advantage 'was taken of it in the manner pointed out by statute. While there is a contention upon the part of each of the defendants that deceased was an employee of the other and wholly under the other's command and control, yet the conceded facts show that the situation was really this: The Construction Company, under its contract with the city, had to take up the old flow line before the new plant was finished, while the city in the meantime had to have water. Both were, therefore, interested in having the new pump station and transmission lines used, and the contract provided that they could do so without prejudice to the rights of either. Hence, in a way, both were jointly in-

terested and engaged in what was being done, the city to get its water and the Company to perform its contract. The Company, however, contends that on the 8th of April, 1922, the city employees were sent to the new pump station where, until the 10th of April, they were under the direction of the Company only to the extent of the latter showing the city employees how to operate and care for the new plant, and that from that date the employees operated it without any control or direction on the part of the Company. It is conceded that the city paid the employees. While we do not think it our province to decide this contention between the defendants, yet if we were called upon to say, we would incline to the view that the city employees at the pump station at this time were under the control of both the city and the Construction Company; and that, therefore, both being engaged in an enterprise calling for the use of wires to carry electricity, both might, under proper circumstances and conditions, be liable for an injury occurring to one of such employees. [Trout v. Laclede Gaslight Co., 151 Mo. App. 207, 222; Ryan v. St. Louis Transit Co., 190 Mo. 621, 637, 639; Geismann v. Missouri, etc., Electric Co., 173 Mo. 654, 667, 673-678.]

Was the city liable under the circumstances disclosed in this case? There is no doubt but that the Construction Company was an independent contractor in the work of building the new plant and installing the new power transmission line; and the fact that the city had an engineer merely to see that the work was done according to the contract does not affect the Company's status as an independent contractor. [McGrath v. St. Louis, 215 Mo. 191; Blumb v. City of Kansas, 84 Mo. 112.] Plaintiff, however, contends that the city is liable notwithstanding the fact that the Construction Company is an independent contractor. As heretofore stated, this may be true under certain circumstances, but is it true under the circumstances here disclosed? Of course, if the injury occurred as a result of the independent con-

tractor's negligence which, at the time the city sent its employeé there, necessarily rendered the employee's place of work unsafe while he was engaged in the ordinary routine of duties naturally expected of him, then the city could not escape liability on the ground that the Construction Company was an independent contractor. For, in such event, it was the duty of the city to exercise reasonable care to see that he had a reasonably safe place to work. But in this case the injury did not arise under such circumstances, nor under circumstances similar to those in the cases cited as holding both the employer and the independent contractor liable. In the case at bar, the city, when it sent its employee to work at the power house, had no reason to apprehend that deceased, in the ordinary routine of his duties, would be exposed to the danger of coming in contact with wires running from the building to the pole; and he would not have been had it not been for the failure of the Construction Company to have proper drains from the pump, which caused deceased to seek the pipe in order to obviate a situation arising, in the operation of the pumps, on account of the want of such drains; and deceased would not have been injured then had it not been for the negligence of the Construction Company in running said wires over the roof of the shed, and within three or four feet thereof, on which it had stored some of its supplies and pipes. The city had nothing to do with creating that situation nor did it have any control over it or over the shed, which was used exclusively by the Construction Company and solely for its own convenience The pumps were new and the city did not know, nor could it anticipate, that the Construction Company would fail to supply drains whereby the employee, in order to remedy or prevent a dangerous situation arising therefrom, would attempt to remedy it and in so doing would seek a pipe on the roof of the shed and be thereby injured. In other words, the city did not send its employee to a place that was necessarily, and in the ordinary course

of events, dangerous and unsafe, but to one where the danger arose through the negligence of the Construction Company not only in not having proper drains but also in running its wires so close to material that was easily accessible and which was well adapted to use in remedying the situation caused by the failure to have the drains; and even then the dangerous situation in the pumping station, actuating the deceased to secure the pipe, did not arise until the pumps were put into operation. Under these circumstances, we do not think the city is guilty of negligence in failing to furnish deceased with a reasonably safe place to work. Certainly it should not be held liable under the petition as it now stands. The principles governing liability of the Construction Company, however, are vastly different. Its negligence produced the dangerous situation, and, with matters in that condition, it had the deceased to come on the premises at its own request and in fulfillment of its own purposes, and said employee of the city lost his life through a situation arising out of the Construction Company's fault.

Since we hold that the city is not liable under the evidence, it is unnecessary to pass upon objections made by it to the instructions.

With regard to the objection made by the Construction Company to plaintiff's instruction No. 1, it should be observed that the instruction did not assume negligence, but, before the jury could find for plaintiff, it required them to find that the defendant Construction Company had erected the brick building and had installed uninsulated copper wires so that they extended over and close to the shed roof and close to iron pipes thereon and that the Construction Company was carelessly maintaining said wires in close proximity to said roof and said pipe. The instruction, it may be observed, is not based upon the same theory upon which the petition is drawn, as to the work decedent was doing nor for whom he was working, but as the case will have to

be remanded for a new trial even as against the Construction Company, on account of an error hereinafter mentioned, this is of no great moment at this time, since both the petition and the instruction can, upon another trial, be drawn to conform to the evidence.

The error hereinabove referred to is in the instruction on the measure of damages which was based upon deceased's probable earnings for his life expectancy *alone,* whereas, the expectancies of his father and mother, principal beneficiaries for whom the suit is brought, were vastly less than his own. [McCord v. Schaff, 279 Mo. 558, 566; Mayberry v. Iron Mountain, etc., R. Co., 249 S. W. 161, 164; Stevens v. Kansas City Light and Power Co., 200 Mo. App. 651, 654.]

Other complaints are raised but no doubt they will not arise on the next trial. The judgment is reversed as to the defendant city, but is reversed and the cause remanded as to the defendant Construction Company. All concur.